**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| *v.* ) | **Case No. 1:23-cr-00252 (ACR)** |
| ) | |
| MARIO MARES, ) | |
| ) | |
| Defendant. ) | |

## MOTION TO REVOKE MAGISTRATE'S DETENTION ORDER, AND FOR BAIL MODIFICATION RELEASING THE DEFENDANT PENDING TRIAL

Comes now the Defendant, MARIO MARES, by and through undersigned counsel, and respectfully moves this Court pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141 et seq., to review and revoke the Texas magistrate's detention order from the proceeding held on August 8, 2023; and to release Mr. Mares on personal recognizance. Alternately, if the Court is not amenable to releasing Mr. Mares on personal recognizance, the Defendant moves this Court to release him into the third-party custody of his wife, with the standard release conditions imposed by the D.D.C. included; or any other least restrictive release conditions the Court may require that allow him to visit with family, run his business, work, and worship God. The Government opposes release under any conditions. Mr. Mares requests an oral hearing and submits the following with incorporated memorandum of law in support and a request in a separate sealed supplement:

### INTRODUCTION - SUMMARY

The charges from this case arise from events that took place on January 6, 2021, near the U.S. Capitol – although Mr. Mares' incarceration has little or nothing to do with any acts on January 6th, and where his detention is unjust and in violation of the Bail Reform Act, 18 U.S.C. § 3142.

The Bail Reform Act, 18 U.S.C. § 3141 et seq., ("The Act") reinforces American justice and liberty principles that go back to the United States of America's separation from England and

its tyranny in that: people should not be held indefinitely in jail without a trial nor jailed because the government opposes their beliefs and alleges criminal activity with prison as a means to silence them. **By the Act, Congress intended liberty as the norm**, with pretrial detention only for carefully limited exceptions. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Furthermore, a bond hearing is not intended by the Act to be a dry run for a trial where the prosecution argues to convict the defendant in order to have bond denied, especially when the Act's rebuttable presumption does not arise. A bond hearing is supposed to ensure that the United States' norm of pretrial release is met when the court fairly and impartially applies Sections 3142(a)-(c) and (g) for its decision. <u>The Act clearly states the defendant is presumed innocent</u>. § 3142(j). In this case, *Mr. Mares was unfairly and unjustly presumed guilty at his bond hearing and section 3142(g) was not addressed using credible evidence to deny bond*. The magistrate gave no reasons why none of the conditions of release could not reasonably assure the safety of the community.

A constitutionally sound application of the Act requires an equal application to all citizens no matter the charge or the calendar day. In Mr. Mares' case, he did not receive equal application. His alleged crimes are all nonviolent. He was apparently denied bond because of his beliefs about the U.S. Constitution and laws. Meanwhile, the overwhelming majority of January 6 defendants, to include those who were accused of assaulting police or glorifying January 6th violence on social media, were released pretrial. Mr. Mares does not argue those results for others and believes the judges followed the Act. The same standards were not applied to his peaceful presence in D.C. The application to him also contrasts with the few ANTIFA rioters sought and arrested for violence in the summer and fall of 2020. They were released despite largescale damages to businesses and attacks on law enforcement and U.S. Secret Service members where over a hundred were injured. Mr. Mares was never violent and has no criminal history. He was unjustifiably singled out and

jailed for his peaceful presence in Washington, D.C. on January 6, 2021 when he should be released under Sections 3142 (c) and (g); and especially under the Chrestman factors.[1]

In the limited circumstances where a detention hearing may be called, the Act makes clear that dangerousness, risk of flight, or risk of obstruction against a witness must be proven. Section 3142(f)(1) and (f)(2). None of Mr. Mares' alleged crimes fall under the Act's rebuttable presumption where he must overcome a presumption of dangerousness. The government ceded the flight and obstruction risk arguments while alleging dangerousness against Mr. Mares under Section 3142(f). 6:23-MJ-027-BU Transcript of Hearing. The Act's standard for detention required the Government to show that Mr. Mares posed a particularized, continuing danger to a person or community by clear and convincing evidence, and that no conditions imaginable could mitigate the alleged risk. Those standards were not met in the bond hearing for Mr. Mares. The magistrate presumed guilt and denied bond with no government identification of anyone endangered and no consideration of release conditions before declaring none would assure safety of the community.

The FBI interrogated Mr. Mares without counsel having been appointed after his arrest on August 2, 2023 to form the foundation of the government's assertion of what is new "opinion thought crime." Mr. Mares is in jail based on presumed guilt when he is innocent, with unjust government assertions that his years' old hyperbole and opinions about laws and gun rights translate to future disobedience of conditions of release. The government presented no credible evidence of any threat, let alone "clear and convincing evidence of a concrete, continuing threat" to anyone or a community. The government asserted baseless speculation that Mr. Mares' current opinions are threatening although they threaten nobody. The Texas proceeding skipped the step that requires that evidence of dangerousness must be clear and convincing, and must involve a

---

[1] The Defense is not agreeing that Chrestman factors should be used under the ACT, but this district uses them. Since that is the case, then Mr. Mares should have been released immediately.

particular person or community. As was done to Mr. Mares, every American arrested for anything can now be denied bond if they express any opinion about a U.S. Constitution topic or a law where their words can be mangled to declare that the defendant will not comply with release conditions. If Mr. Mares' detention is allowed to stand, the Bail Reform Act has ceased to exist as intended and written.

This Court should release Mr. Mares because he meets release determination under § 3142(g) and (c) of the Act. Mr. Mares never said or inferred he would disobey the court. He never said he would act against anyone. He never once said that he would act outside the law. To the contrary, he stated that he obeys laws even if he disagrees with them. The government juxtaposed hyperbolic social media speech (venting with no acts) that he made years ago with his current philosophical beliefs about laws, to then baselessly declare that he would act to defy release conditions. If the DOJ and FBI at the behest of administrations in power continue to designate opinions that are not accompanied by acts with potential for violence as prison-worthy threats, then there are not enough federal prisons. The movement to injustice means that any and all Americans can be incarcerated based on protected First Amendment speech.

Mr. Mares should be immediately released because he is presumed innocent of the charges, there is no law for "opinion crime," and under First Amendment speech he can respond to and disagree with gun laws, calls by former Speaker Pelosi to physically assault the sitting U.S. president, and political corruption. His use of clear hyperbole from years ago should not be mischaracterized to allege that Mr. Mares has sinister intent. Certainly, social discourse has strayed outside of politeness in internet interactions, and needs a universal overhaul. But there can be no rational answer to why Mr. Mares' use of figurative speech, that might be along the lines of saying 'corrupt politicians ought to be strung up' requires incarceration, while Joe Biden's campaign

statement in 2020 that he wanted to take President Trump out 'behind a barn and beat him' warrants celebration across news media. Are we really to believe that FBI interrogators are so incompetent that they cannot distinguish hyperbole from words backed by a plan, means, intent, motive, and act to cause violence?  We cannot accept schemes that manipulate the Act by mischaracterizing words to then incarcerate Americans who love their country unless we want to install tyranny.

Mr. Mares went to Washington D.C. to exercise his First Amendment rights at the Ellipse rally. He is an American with Christian values who loves the U.S.A. and supports the rule of law and honest law enforcement. He is on friendly terms with his county's law enforcement. He did not plan to go to the U.S. Capitol on January 6th. He did not even finally decide to go to the D.C. rally until January 3 - 4, 2021 when "Subject 1" (as labeled by the government) said that he and "Subject 2" (as labeled by the government) wanted to go with Mr. Mares. He did not know about a march to the U.S. Capitol until it was announced at the end of President Trump's speech on January 6, 2021, and when people nearby at the rally began encouraging everyone to go on the march. He joined the march where thousands of people peacefully preceded him on the streets.

The charges against Mr. Mares in the Indictment at ECF No. 1 do not involve violence but are serious. Under the U.S. Constitution and the Act, **Mr. Mares is presumed innocent**. Notably, he **never threatened the FBI as the government falsely claimed in the arrest warrant's** restricted page 2. The false accusation that he threatened the FBI was written from out of the blue without any support when added to the arrest warrant's sealed, non-public page 2 that this Court has available. On January 6, 2021, Mr. Mares committed no violent act, didn't tell others to act illegally, did not go inside the Capitol building, did not breach any police lines or barriers, did not threaten anyone, did not obstruct anything or anyone, and damaged nothing. The government's usual method of describing and showing what others did in order to convince judges and juries to

convict him because of what others did started in this case with the government's effort to unjustly incarcerate Mr. Mares. It addresses what Subject 1 and others did, with nothing substantive or credible about Mr. Mares. The magistrate mysteriously never asked why the government appears to have done nothing about Subjects 1 or 2.

The magistrate's detention Order (6:23-mj-00027-BU, ECF No. 16 at 2; filed 08/08/23) checked the block on Form AO 472 to <u>falsely state that Mr. Mares had a violent history when he has no criminal history and no violent history</u>. This falsehood was a reason for pretrial detention. **Mr. Mares should be released because of judicial reliance on false information to deny bond**.

Mr. Mares expressed his beliefs in figurative terms about applying law to corrupt politicians, and said he disagreed with laws against Constitutional firearms carry ("open carry"). He said he obeyed those laws. Mr. Mares repeated that he did not carry a firearm onto U.S. Capitol grounds. At the detention hearing on August 8, 2023, the government used out of context words to mischaracterize Mr. Mares' beliefs. The Defense apparently was not provided the interrogation Form 302 "evidence" or the transcript with the FBI's hypothetical questions they posed for argument that is exculpatory rather than damning of Mr. Mares.

The government used his beliefs to demand detention without any evidence he intended or was capable of any future criminal act. The unjust result was detention without evidence, let alone the Act's required clear and convincing evidence, that Mr. Mares posed a particularized, concrete, continuing threat to any person or community. The magistrate accepted baseless speculation by the government that because of his "opinion crime" beliefs Mr. Mares would not follow release conditions. The government said no release conditions would suffice and with nothing more said about any release conditions, the magistrate agreed despite the Act's requirement that he explain reasons why specific conditions would not reasonably assure Mr. Mare's appearance or safety.

Mr. Mares, unjustly presumed guilty by the magistrate's own words, is incarcerated without any required explanation by the magistrate as to why each and any of the multitude of conditions of release in Section 3142(c), and third party release could not reasonably mitigate the unproven and unclear danger. Formerly, assertions of "will not comply with release conditions" used to involve revocation of an existing release order where the defendant in fact did not comply with conditions of release; or they involved a defendant with a history of violating release conditions or failing to appear in court as related to past crimes and proceedings. In Mr. Mares' case, release was denied with no evidence proving flight risk or danger, no criminal history and thus no history of flight or violating release conditions.

A separate sealed filing will be a supplement to this Motion as allowed by the Court because the majority of the government's allegations to have Mr. Mares detained appear to rely upon "sealed" falsehoods presented by Subjects 1 and 2. The Sixth Amendment may be implicated based on when and what the government previously provided to this and the Texas Court. Mr. Mares was not allowed to confront accusers from outside the bond hearing. The government did not then, and will not now after request, provide all available impeachment evidence.

The government meets all criteria for *Brady* and *Giglio* violations except the government may believe that in the pretrial stage, it can thumb its nose at the Court's order to provide materials.[2] The government is *not required by any law* to be 100% truthful with a grand jury or to show multiple inconsistent prior statements by, or impeachable evidence about its witnesses. Here,

---

[2] Court opinions on *Brady v. Maryland* and *Giglio* address trials, verdicts, and sentences. A grand jury's indictment that results from government misrepresentations about witness credibility, hiding inconsistent and conflicting prior statements, and hiding impeachment evidence may have pretrial application in *Brady* if detention impacts trial preparation and the verdict. Given loss of liberty, the defendant cannot prepare and fully assist in his defense. Government incarceration to pressure a plea impacts trials and verdicts. Detention based on knowing concealment of exculpatory evidence is in a gray zone. The Fourth and Fifth Amendments are often applied based on the prosecution's withholding of material that favors or exculpates a defendant in pretrial stages. The sealed supplement addresses apparent Constitutional violations.

despite requests, the government refuses to provide all interviews and statements, with all Form 302s and 1023s, that may show inconsistent statements or evidence that witnesses were potentially enticed or pressured to make self-serving false statements. Mr. Mares' rights were violated.

Since at least March 2021 the FBI's disregard of rights included an illegitimate domestic terrorism inquiry and investigation of Mr. Mares. The FBI abused the "Patriot Act" to compile information about him from dozens of platforms, institutions, and services without warrants. What served as an unconstitutional "general warrant" was hidden behind illegitimate domestic terrorism investigation. But after finding nothing illegal or dangerous, the government failed to tell the grand jury, and magistrate and Defense in Texas that after two and a half years they found nothing against Mr. Mares. There were no internet searches, contacts, or attempts to engage in illegal purchases of firearms for example. All Mr. Mares' life activities were legal. This exculpatory information was deliberately hidden while the government engaged in presenting fiction. The magistrate, based on government allegations that hid the exculpatory information, inferred that even though all his firearms were taken by the FBI during the home search that Mr. Mares would illegally acquire a weapon in violation of release conditions. The failure by the government to provide the exculpatory information was deliberate and caused wrongful consequences of detention.

There are no apparent FBI manhunts or arrests of Hamas funders and supporters in the U.S. who called for violence against Jews after Hamas's slaughter of Israelis on October 7, 2023. There was dangerousness shown when thousands of American protestors blocked passage inside federal government buildings, on campuses, and on public roads to support Hamas. Hamas's ideology and acts embrace the murder of all Israelis and Jews worldwide. For acts by antisemitic protestors there are no civil disorder and other federal charges such as Section 1512(c) "Obstruction of Congress." Those protestors were not arrested and jailed. There are no domestic terrorism manhunts or

investigations related to the tens of thousands of antisemitic American protestors who declared Hamas was justified in killing babies, raping women, killing parents, killing teens, conducting beheadings, and slaughtering Israelis. But Mr. Mares' past hyperbolic speech without action or means to act, and his current opinions and hyperbole about laws was framed by the government into "opinion crime" to jail him.

The government did not tell the magistrate that in addition to letters and document requests to Mr. Mares' service providers that likely Department of Homeland Security's (DHS) expensive unmanned aerial vehicles (UAVs) that were supposed to surveil the Texas border or look for signs of terrorist training camps instead overflew Mr. Mares' home. The claim was that these national security assets were required for aerial imagery because normal ground surveillance was not possible. In self-exposure of this UAV farce, the FBI many months later did what was always available: they drove through the rural area many times prior to arresting Mr. Mares. And while the FBI and DHS were wasting scarce resources on Americans who had no foreign nexus, they ignored Hamas, Hezbollah, other foreign terrorist groups, and terrorist infiltration hidden within the tens of thousands of military aged males who illegally crossed the open U.S. southern border.

There are extremists and mentally deranged people who can attack almost anywhere and anytime with a multitude of means (not all firearms) where a response is needed immediately — where police are not an immediate response force. Mr. Mares is in jail because he opined that he should be able to carry a firearm openly and corrupt politicians should be prosecuted. Mr. Mares was vilified by the DOJ and jailed because he believes in common-sense, responsible, visible deterrence as allowed by the Second Amendment to prevent and defend against violent acts by those who seek soft, undefended targets.

Mr. Mares' history shows he is peaceful and abided by laws - particularly gun laws. Mr. Mares abided by Texas's process and rules to apply for and receive a concealed carry permit even though he might have disagreed with the permit requirement. He told his travelling companions they could not carry firearms in D.C. He did not carry a firearm in D.C.

For thirty three months after January 6, 2021, Mr. Mares lived peaceably where the DOJ and FBI did not have any reason to and did not warn law enforcement in and around his hometown that Mr. Mares was "dangerous."  Incredibly he became dangerous only after arrest and an FBI custodial interrogation that by design created "opinion crime." The government had no acts and nothing dangerous upon which to base the assertion that Mr. Mares would disobey the court. With no clear and convincing evidence of anything, at the August 8, 2023 bond hearing the DOJ violated application of the Act by not showing dangerousness first when alleging the peaceful Mr. Mares would not follow release conditions. There is no legitimate reason for Mr. Mares to be in jail.

Because of the Government's failure to provide impeachment evidence as requested by the Defense; where government witnesses lacked credibility in statements made to the grand jury; and where the government showed no clear and convincing evidence of dangerousness to anyone by Mr. Mares, and because Mr. Mares is presumed innocent and would follow this Court's orders, this Court should release Mr. Mares.

## MEMORANDUM OF LAW

### I.   BACKGROUND FACTS

Mr. Mares attended the rally at the Ellipse in Washington D.C. on January 6, 2021.

He tentatively decided to travel to D.C. on January 3, 2021 after he encountered Subject 1 the previous day in town. Subject 1 asked whether Mr. Mares was going to D.C., and if Mr. Mares would provide transportation. Mr. Mares knew the man casually since their businesses did similar

work. The trip was not definite until the morning of January 4, 2021 when Subject 1 confirmed he had a dog-sitter, and that Subject 2 would be travelling with them.

Subject 1 and Subject 2 were good friends and neighbors. Mr. Mares did not meet Subject 2 until January 4, 2021 when Subject 2 loaded his luggage and entered the truck. Mr. Mares did not direct either passenger to bring anything to D.C.

Mr. Mares departed Texas for Washington, D.C. by noon on January 4, 2021, driving his two passengers. On January 4, 2021 they stayed overnight at a motel in Tennessee, and arrived in Fairfax, Virginia on January 5, 2021 around 9:00 p.m.

Subject 1 made the room reservations when they were several hours away from Virginia. He reserved rooms so that Subject 2 had his own room and Subject 1 and Mr. Mares would share a room. Mr. Mares never asked to share a room.

Prior to going to the hotel, the men attempted to dine at a chain restaurant in Virginia but were told that they had to wear masks. Subjects 1 and 2 asked to instead be taken to a fast food drive-thru where they ordered takeout (Mr. Mares did not order the fast food). Mr. Mares and his passengers' check-in at the Comfort Inn in Fairfax, VA was around 9:35 p.m. according to receipts.

Mr. Mares did not bring any "ammo cans."  Any container of that style remained at his home. He did not purchase the blue canister that is shown as figure 25 in the government's supplemental 6:23-mj-00027-BU ECF No. 14 until after January 6, 2021.

Subject 2 signed for his own room at the front desk at check-in at the Fairfax, VA hotel.

Subject 1 paid for the room he reserved to share with Mr. Mares. The receipt and associated paperwork are classified as "highly sensitive" by the government. Subject 1 would not accept money from Mr. Mares for the room. Subject 1, with child support payments and suffering the

same business setbacks as other welders during Covid-19, charged multiple rooms to his credit card without explanation of his funding source.

On the night of January 5, 2021, after reaching the shared room, Mr. Mares ordered food delivery and in the interim took a shower. When he exited the shower, both Subject 1 and 2 were in the room. Subject 1 had without permission arranged firearms, including Mr. Mares handgun, on Mr. Mares' bed and taken pictures. *Id*. at 18, Figure 19.

Mr. Mares was unaware that Subject 1 subsequently posted on Facebook - either on January 5th or 6th - the choreographed picture of the firearms with the caption "F* Washington DC." Mr. Mares had been locked out of his account and no longer used Facebook in January 2021.

Subjects 1 and 2 inexplicably loaded bags on a luggage cart on the morning of January 6, 2021 and placed the bags in the truck. Mr. Mares drove to D.C., parked, and walked many blocks to get to the area of the rally.

Mr. Mares had no plan or intention to go to the U.S. Capitol when he arrived in the area for the rally. He did not know about the march to the Capitol until told at the rally site after noon.

Based on the massive crowd, Mr. Mares attended the Ellipse rally from a distance where he could not see the stage, but monitors and speakers projected music and speeches to the crowd.

Mr. Mares and his passengers arrived back at the Comfort Inn by around 6:15 p.m. on January 6, 2021. It is impossible to verify the time because the government edited and altered the inside and outside hotel CCTV "evidence."

The government showed altered, spoliated CCTV clips and screenshots at the Texas detention hearing. All CCTV video and pictures presented by the government came from edited, spoliated CCTV evidence. The magistrate and defense were not told this. The CCTV from the Comfort Inn that was provided to Mr. Mares' current attorney was all edited and spoliated.

The government used screenshots from the CCTV to misrepresent truth. The government presented screenshots at Figures 9 to 11. The government claimed that Mr. Mares was wearing a visible holster. Figures 9 and 10 show Subject 1 pushing the luggage cart with his and Subject 2's bags. Mr. Mares is not in Figure 9. In Figure 10 Mr. Mares' right hip and right side are not visible. The government deceptively eliminated the imbedded video time stamp from Figure 11 and placed it last to make it appear it was associated with Figures 9 and 10.

Figure 11 was taken well before the departure to the rally depicted in Figures 9 and 10. Figure 11 is Mr. Mares entering his room upon returning from a trip down the hallway. The circle shows the edge of Mr. Mares' medical aid kit. The government calls it a handgun. The placement of the figure and elimination of the time stamp misleads the viewer to believe this was simultaneous with or after the content of Figures 9-10. 6:23-mj-00027-BU Memo; ECF 14 at 12.

The government provided ninety-eight CCTV video clips for the second floor of the Comfort Inn which allegedly was the floor where Mr. Mares and Subjects 1 and 2 stayed. The CCTV video was labelled in each government file name as containing fifteen minutes of video. Had each clip contained fifteen minutes they would have covered ~24.5 hours.

Generally, at least six minutes of all ninety-eight clips labelled as being fifteen minutes of hotel CCTV was missing. That is not the major spoliation problem although multiple six minute segments may include exculpatory information by showing who was in the hallway and when.

Every file's label did not match the start or end time of the CCTV clip. The labelled start time in the file name was off by fifteen minutes or more from the start time embedded in the CCTV footage. It is not possible to tell what start time was true because of the CCTV video alteration.

The ninety-eight CCTV clips of the inside second floor hallway were all altered and spoliated. The CCTV video clips whose clock timestamps cover fifteen minutes from the start time

to the video end time, as imbedded within the images, contain videos that are only eight to nine minutes. But the imbedded start and end times of the CCTV video are fifteen minutes apart. For example, a video that started at 6:00 p.m. and ended at 6:15 p.m. as shown by the running clock imbedded at the top of the video is actually only nine minutes of run time.[3] The video time clock should have ended at 6:09 p.m. but it did not. The government spoliated every video where about six minutes of video is missing but the imbedded start and end times cover fifteen minutes blocks.

The clips for the hotel's inside second floor and outside entrance view CCTV clocks do not match based on government alteration of video. Mr. Mares' truck returning from the rally, and Subjects 1 and 2 unloading their bags, with use of a luggage cart is time stamped within the main entrance CCTV video *after* Subject 1 is shown on a timestamped second floor CCTV taking the luggage cart into a room.

The 104 outdoor main entrance CCTV videos are labelled by the government to indicate fifteen minute clips. The government's time in the file label and the CCTV start and end times do not match.

The main entrance CCTV videos show imbedded fifteen minute time periods from start to end. But the CCTV video lengths are longer than fifteen minutes in run time and by the time bar. For example, in the government's labelled file name for January 6, 2021 from 22:54 to 23:09 the CCTV video's imbedded start time is 10:57 p.m. and the end time is 11:12 pm. But the video time bar shows, and the video play time is approximately 18 minutes.[4]

---

[3]  This can happen in a number of ways - where none are good. One way cuts and compression that makes activity in a time segment become invisible for lack of a better word. Each way plus a number of other video editing hacks destroy credibility of the entire video. As an additional note, a number of video editing tools can allow replacement of imbeds, such as the running clock.

[4]  There is no telling what alteration technique was used to turn fifteen video minutes into eighteen video minutes while keeping a fifteen minute start to finish on the embedded run clock in the video. Video with activity, such as undercover agents outdoors, may have been deleted and replaced.

Sometime after 8:30 p.m. on January 6, 2021 Subject 1 said he had "talked to people" and "they" told him police were searching hotels and arresting people who attended the rally. Subject 1's departure to go "talk to people" cannot be isolated because of CCTV spoliation.

Subject 1 insisted that despite doing nothing wrong they would be arrested if they did not depart their paid for hotel rooms before morning. Mr. Mares drove the two subjects and they arrived back in Texas on January 8, 2021.

The FBI conducted an interview at the sheriff's office with Mr. Mares on March 31, 2021.

The FBI report stated that Mr. Mares was "polite and cordial." The report stated that after noticing that Mr. Mares was armed, the agent, "requested that he disarm prior to the interview, which he did by placing his firearm in his vehicle." Mr. Mares accommodated the law enforcement request, despite his right to carry his handgun. Discovery 266T-DL-3397664 Serial 4.

The above material information regarding the March 31, 2021 FBI interview was not made available for the Texas magistrate's bond hearing on August 8, 2023. The FBI made no other attempt to contact Mr. Mares during the extended period between March 31, 2021 and his arrest.

Mr. Mares was arrested at his home in Texas on August 2, 2023 over two and a half years after January 6, 2021. 1:23-cr-00252-ACR ECF No. 5 Arrest Warrant at page 1.

The ECF No. 1 Indictment charges Mr. Mares with violating four federal laws as follow:

> Count One: Entering or remaining in a restricted building or grounds with a deadly or dangerous weapon under 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);
>
> Count Two: Disorderly and disruptive conduct in a restricted building or grounds, under 18 U.S.C. § 1752(a)(2);
>
> Count Three: Unlawful possession of a firearm on Capitol grounds or buildings, under 40 U.S.C. § 5104(e)(1)(A), and
>
> Count Four: Disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D).

Mr. Mares peacefully surrendered when ordered by law enforcement to exit his home and be arrested on August 2, 2023.

After investigating Mr. Mares since February 2021, to include abusing domestic terrorism law to examine every detail and aspect of his life, upon the FBI arrested him on August 2, 2023 the government immediately requested a three day continuance for the detention hearing.

The FBI's August 2, 2023 interrogation and subsequent report on August 7, 2023 was produced during the continuance period to justify detention. It appears the Defense did not receive the interrogation report and recording before the August 8, 2023 bond hearing.

On August 2, 2023 Mr. Mares clearly told the FBI during custodial interrogation that he did not carry a handgun on the Capitol grounds or at the Ellipse rally in D.C. on January 6, 2021.

The government's supplemental memorandum, (TX Memo ECF No. 14) 6:23-mj-00027-BU and court argument mischaracterized Mr. Mares' words, especially from August 2, 2023.

The magistrate ordered detention (6:23-mj-00027-BU ECF Nos. 16 and 17 filed on 08/08/23) with no written opinion or oral reasons why all release conditions were inadequate.

TX ECF No. 16 at 2 shows the magistrate checked the block that a history of violence or use of weapons by Mr. Mares was a reason for detention. This declaration was false.

Mr. Mares has no criminal history and no alleged violations of weapon use.

The Defense received the official transcript as the hearing record with the assistance of Mr. Mares' Texas public defenders. All transcript references are to 6:23-mj-00027-BU All Defendants USA v. Mares; ECF No. 21 produced on September 26, 2023. (To be emailed for Court use).

The rebuttable presumption under §3142(e) does not apply to Mr. Mares' case.

The case is eligible for a detention hearing under 18 U.S.C § 3142(f)(1)(E) only because of the false allegation in the Indictment that Mr. Mares carried a firearm on U.S. Capitol grounds.

Except for one known case where carrying a deadly or dangerous weapon was charged *without any assault* such as in this case, other defendants were all released on bond.

In most cases where allegations of assault with a deadly or dangerous weapon were made, the defendants were still presumed innocent and released on bond.

No police officers were killed at the U.S. Capitol or on its grounds on January 6, 2021.

Mr. Mares did not participate in a riot on the U.S. Capitol grounds. He did not witness any assault of law enforcement, he did not obstruct law enforcement, and he did not travel interstate for the purpose of being violent in a riot (a requirement to be labelled a rioter under federal law).

Mr. Mares is not accused of any crime of violence or property damage.

He did not engage with any police, cross any police line, or enter the U.S. Capitol building on January 6, 2021. He did not knowingly go on any grounds that appeared closed to public entry.

No credible, unaltered video, picture, or testimony shows Mr. Mares carrying a firearm in D.C. on January 6, 2021. He denies carrying a firearm in D.C.

Subjects 1 and 2 who travelled with him to Virginia and D.C. do not show up in public view as charged with a crime or arrested according to any Texas or D.C. district court docket. Mr. Mares' Texas case identifier states it is for "all defendants" but any other defendants are invisible.

Mr. Mares lived freely and peaceably from January 6, 2021 until his arrest on August 2, 2023. He was out and about working in the community, with his normal family and social life. At no time during those thirty-two months did the federal government advise any local law enforcement that Mr. Mares was a threat to anyone.

Subject 1 told one or more local residents that he pled guilty to a crime for January 6, 2021 because he was pressured by the FBI. There is no charge, arrest, or plea on public record.

In violation of Bail Reform Act standards, the magistrate did not address any conditions for release after hearing testimony from the proposed third party custodian. The magistrate did not write anything - he just declared that no conditions would assure the safety of the community - when the community was safe for thirty-three months after January 6, 2021.

Despite the Government failing to identify a particularized, ongoing danger to any person, any place, or any element of his community—Mr. Mares was remanded by the magistrate.

The magistrate speculated outside the Act's presumption of innocence and without credible evidence that Mr. Mares was guilty of carrying a gun in D.C. Bond Transcript, 67:9-14.

Mr. Mares admitted he brought a handgun to Virginia but did not bring or carry it in D.C.

Mr. Mares did not own a cross-body holster rig. He is right-handed. His holster for the handgun he brought to Virginia loops into his waist belt and rides below the belt on his right hip.

The government asserts that Mr. Mares' "love handles" or "spare tire" under the camouflage pattern shirt are a handgun. The government circled at least three distinct sections of his body covered by the camouflage pattern and asserted that each showed a handgun outline.

Mr. Mares' holstered handgun that he took to Virginia could never ride as high above the waist on his abdomen as circled in the pictures. TX Memo ECF No. 14. at 14-15; Figures 13-16.

The government asserted that love handles under his shirt's camouflage pattern indicated a gun. No holster or bulge is visible below his waist on the right hip. He owned a hip holster.

The locations circled in pictures by the government showed Mr. Mares' right front belly above the waist, a different location at his right hip running along his side above the waist; and his back above the waist. The government claimed that each location simultaneously - while physically impossible - contained a single handgun. TX Memo ECF No. 14 at 14-15; Figures 11; 13-16.

The custodial interrogation recording apparently was not provided to Mr. Mares' public defenders where they could argue the mangling of words after Mr. Mares said he follows gun laws.

The Government conceded that flight risk was not applicable to Mr. Mares:

> With regard to flight risk, we would totally concede
> that that's not much concern in this case. He has long-standing
> ties to the community. We believe that there is probably some
> danger because he now faces the possibility of imprisonment in
> Washington, DC. But, again, flight risk is minimal here. It's
> really not a concern that should be before this Court.

Bond Hearing Transcript 49:6-11.

THE COURT: I would agree with that. *Id*. 49:12.

The government alleged that Mr. Mares' figurative speech in on-line posts in December 2020, where Mr. Mares took no action nor had the means to pose a credible threat at any time to anyone in D.C., were relevant three years later in August 2023. *Id*. at 49-50.

Never between December 2020 and August 2, 2023 did the government warn local law enforcement in Texas that Mr. Mares was a danger to anyone.

Mr. Mares was never a member of any militia or group that espoused overthrow of government (such as Antifa that the FBI and DOJ say is just an "idea).

The U.S. Capitol Police (USCP) never interviewed or investigated Mr. Mares for his media posts, nor indicated the USCP considered Mr. Mares a threat to anyone in Congress.

January 6 defendants' conditions of release forbid travel to D.C. except for court matters.

The magistrate stated:

> I'm convinced without hesitancy that no
> matter what I rule today, no matter what conditions I impose --
> you may believe that they're ill-advised, politically motivated
> or just infringe upon your rights, but I have no confidence that
> you will regard them any higher than you regarded the rules of
> the District of Columbia.

ECF No. 21 TX Bond Transcript, 67:9-14

This case involves hidden impeachment and exculpatory evidence, and apparent Constitutional violations that can only be addressed in the sealed supplement.

### III.    LEGAL STANDARD

"Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)).

The Statutes that apply for pretrial detention and release Are:

> (1) 18 U.S.C. § 3142 (Release or detention of a defendant pending trial);

> (2) 18 U.S.C. § 3145 (Review and appeal of a release or detention order); and

> (3) 18 U.S.C. § 3156 (Definitions)

According to the Bail Reform Act, a person who is ordered detained by a magistrate judge can file with the court having original jurisdiction over the offense a motion for revocation of the order. 18 U.S.C. § 3145(b).

And while "the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to de novo review." See *United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017) (referencing multiple Circuit cases). This District reviews de novo. See *United States v. Louallen*, Criminal Action No. 19-66 (JDB), 2 (D.D.C. Feb. 28, 2019); *United States v. Chrestman*, 21-mj-218 (BAH), 2021 WL 765662, at *5–6.

A detention hearing can be held only if a case involves certain enumerated categories of offenses listed in 18 U.S.C. § 3142(f)(1)(A)-(E), or if the defendant poses a serious risk of flight or will obstruct justice by threatening a witness or juror. § 3142(f)(2)(A)-(B). Once the predicate for the detention hearing is shown, the judge determines whether to release the defendant based on

the factors in § 3142(g). "In common parlance, the relevant inquiry is whether the defendant is a flight risk or a danger to the community." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) ((citing *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

The Act addresses release where the judicial officer must determine whether the accused is to be (1) released on his personal recognizance or upon execution of an unsecured appearance bond, (2) released subject to a condition or conditions stipulated by the Act, (3) temporarily detained for the purposes stated in the Act, or (4) detained pending trial. Section 3142(a).

"The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. " 18 U.S.C. § 3142. See also *Salerno*, 481 U.S. at 750; *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

In deciding, the court is to consider the facts within the following statutory factors:

> 1. The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a minor victim or narcotic drug;
> 2. The weight of the evidence;
> 3. The history and characteristics of the person, including
>     a. His character, physical and mental condition, family ties, employment, financial resources, length of residence in the community and community ties;
>     b. Past conduct, history relating to drug or alcohol abuse;
>     c. Criminal history;
>     d. Record concerning appearance at court proceedings;
>     e. Whether, at the time of the current offense or arrest, the person was on probation, parole, or on other release pending trial, sentencing, appeal, or . . .
> 4. The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

In determining pretrial detention for January 6 defendants, this District uses "guideposts" within the § 3142(g) nature of the offense, for "comparative culpability of a given defendant in

relation to fellow rioters." *United States v. Chrestman*, 525 F. Supp. 3d 14, 26 (D.D.C. 2021)[5]:

> (1) whether a defendant has been charged with felony or misdemeanor offenses.
> (2) any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear.
> (3) a defendant's carrying or use during the riot of a dangerous weapon, whether a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement, indicates at least some degree of preparation for the attack and an expectation that the need to engage in violence. . . .
> (4) Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol.
> (5) a defendant who assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct. . . .
> (6) a defendant's words and movements during the riot reflect the egregiousness of his conduct. Did the person threaten or confront law enforcement or celebrate efforts to disrupt the certification of the Electoral College vote?

*Id*. at 26-27.

In cases where flight or dangerousness are alleged, Congress provided sample release conditions where the defendant must not commit another crime and the judge must apply the least restrictive means necessary to accommodate release while reasonably assuring the defendant's court appearance and community safety. § 3142(c)(1)(B) lists thirteen not all inclusive, specific conditions for release (such as remaining in the custody of a designated individual, maintaining employment, periodic reporting to a designated law enforcement agency, avoiding all contact with a witness, and refraining from possessing a firearm) that the judicial officer should consider when risk mitigation is implicated. In addition, it contains a catchall provision for any other condition a judge might consider "reasonably necessary" to assure the accused's appearance and the community's safety. *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

---

[5] Nothing in the Act indicates that individuals charged with crimes in one location should be compared against each other's words and actions for release. Each assessment under Section 3142(g) is supposed to be by individual - with a presumption of innocence and not by the clothes worn, protected speech, and what others did. The guideposts infer that legal clothing for example automatically shows a level of guilt.

"Detention cannot be based on a finding that a defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise the scope of detention would extend beyond the limits set by Congress." *Munchel*, 991 F.3d at 1283.

## IV.    ARGUMENT

**Mr. Mares should be released because he is not a danger to anyone and not a flight risk; he will remain peaceable; and because release conditions can reasonably assure any apprehensions arising from the government's fabrication that he endangers anyone.**

Mr. Mares is an ideal candidate for pretrial release. He has many solid ties to the community, a history of employment including his own business, economic stability, a loving wife and supportive family, and no criminal history. He has never been violent. Accordingly, Mr. Mares respectfully requests that this Court overrule the Detention Order imposed by a United States Magistrate Judge in the Northern District of Texas and release him back to his home in Texas under his own recognizance with standard conditions, and as the Court determines the least restrictive additional conditions. Without question, despite the nature of the charges, he falls in the category of defendants that Congress intended to be released pretrial under the Bail Reform Act. For Mr. Mares' security, he should be issued an order of protection where any false accusers will be restrained from contact since Mr. Mares deserves this protection when he is released.

The magistrate's and government's speculation about Mr. Mares' opinions and then the presumption of guilt to deny bond defied the Act because of lack of: proof of dangerousness by clear and convincing evidence of any particularized, continuing, concrete danger to anyone; clear and convincing evidence as to why specific release conditions would not reasonably assure his appearance in court and the safety of the community; and clear and convincing evidence why all possible conditions of release imaginable would fail to reasonably assure the safety of any

particularized person or community. Mr. Mares is the person in this case who is already harmed by false accusations and hidden impeachment evidence.

The government told the magistrate that Mr. Mares would ignore court orders. He has no history that supports the allegation. However, there is no doubt from the government's supplemental memorandum from the Texas bond hearing (TX Memo, ECF No. 14) that it failed to acknowledge exculpatory material where after more than two and a half years of terrorist investigation, it found nothing dangerous about him. The government had no history, acts, or anything dangerous upon which to base the assertion that Mr. Mares would disobey the court.

Mr. Mares spoke in hyperbole in December 2020 where none of his speech fell into the category of a real threat in violation of any law. Mr. Mares had no means and did not say he was going to act out anything. In the case of one post with no evidence that anyone cared about it, he was sounding off about Speaker Pelosi's call for President Trump to be dragged out of the White House by his hair. The FBI, U.S. Capitol Police, and Secret Service didn't care about that post. And they regularly ignored members of Congress' threats against the President, Supreme Court justices, those in the Trump administration, and any "Make America Great Again" supporters.

Senators Schumer's and Waters' calls to their public supporters to act, that were publicized to news outlet audiences of many millions, led to actual acts or attempted acts of violence. This included multiple members of the Trump administration being verbally assaulted and forced out of restaurants, with attempted violence against a U.S. Supreme Court Justice. The Justice's confirmation hearings had been repeatedly obstructed without any offenders going to jail or charged with federal felonies. The scales of justice are not equally balanced when almost three year old hyperbolic speech that was not on January 6th – and with no action by the nonpublic

figure Mr. Mares and all of perhaps one to seven people who saw the posts – was presented to mischaracterize him and deny bond. He did nothing wrong and did not try to act out any hyperbole.

The use in late 2023 of irrelevant past speech by Mr. Mares is ludicrous since on January 6, 2021 and afterwards he was no longer on any social media platform besides Instagram for the promotion of his business. Subject 1 is the person who was livestreaming and posting pictures for his mystery audience. Mr. Mares was not party to Subject 1's social media activity. Mr. Mares had no plan or intent to go to the U.S. Capitol on January 6, 2021 where instead the only item in mind was to tour D.C. and sight see after the rally.

Because there is no clear and convincing evidence that Mr. Mares poses a danger to anyone, and because no argument can honestly be made when there is no evidence, let alone clear and convincing evidence, that no single or combination of release conditions will *reasonably assure* Mr. Mares' presence in this Court and the safety of the community, he should be released under the Bail Reform Act where liberty is the presumption.

### A.  Mr. Mares is Eligible For Detention Only Because of the False Gun Charge and Should Be Released Because There is No Dangerousness as Required Under the Meaning of the Act.

Mr. Mares is eligible for a detention hearing under Section 3142(f)(1)(E) only because of the false firearm allegation. He should be released because the government did not and cannot make any showing by clear and convincing evidence that he poses a continuing, particularized danger to any person or community and because in violation of the Act he was presumed guilty at his bond hearing where the magistrate then presumed he would not comply with release conditions. "The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142. There were

no facts and no clear and convincing evidence of dangerousness or prospective noncompliance with release conditions.

Mr. Mares has no history of dangerousness. He was completely peaceful on January 6, 2021. Mario's community and family ask this Court to send him back home. Nobody in his community who knows his character and the truth from observing years of his conduct views him as a danger to anyone. Any assertion that Mario would harm anyone is a fabrication. See Support Letters, Exhibit 1.

The government ceded any flight risk argument and never argued that Mr. Mares would obstruct any witness testimony. It is to Mr. Mares' benefit to have any alleged hotel witness and Subjects 1 or 2 testify as government witnesses at trial should this case proceed. The impeachment evidence the government did not provide to the Defense at the Texas bond hearing or to the current Defense now after a written request in September 2023 will nail the coffin shut on prior government misrepresentations and the credibility of government witnesses. Sealed Supplement.

"Detention cannot be based on a finding that a defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight." *Munchel*, 991 F.3d at 1283. Yet in Mr. Mares' case, the magistrate denied bond by presuming guilt for the alleged crimes, and then without any finding of dangerousness by evidence, let alone the required clear and convincing evidence, he declared that Mr. Mares would not comply with release conditions.

To deny bond based on prospective dangerousness, the government must establish that Mr. Mares poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. *Munchel*, 991 F.3d 1273, 1279–80 (citing *Salerno*, 481 U.S. at 751). This standard does not invite the use of stale and no longer visible social media posts or irrelevant government imagination about what could have happened on January 6, 2021.

The evidence must be about what Mr. Mares, and not others, did. There must be a credible threat to a named person or group that already started and now continues. None of that was or can be shown clearly and convincingly, and none of that exists in this case.

No fact indicates that Mr. Mares attempted any act of violence on January 6th because he did not. He never attempted to enter the building. He never assaulted anyone. He did not go in search of any member of Congress. He never joined chants to hang anyone, despite those being figurative and hyperbolic. No endangered person or community was identified by the government. We cannot assume as the government apparently wants us to that from his philosophically stated, nonviolent beliefs, Mr. Mares will work by day to support his family and then transform into a vigilante bounty hunter who travels cross country during nights to jail corrupt politicians. Whatever the prosecutors imagined, they did not and cannot meet their burden of showing clear and convincing evidence that Mr. Mares is a threat to anyone or that he would not comply with release conditions.

A threat to anyone must be concrete and continuing. *Id*. at 1280. The government showed no evidence of any threat and instead manufactured a speculative future to claim that Mr. Mares will not abide by release conditions because of his Second Amendment opinions. The government did not name a person or community where any concrete, continuing, particularized threat arises from Mario. He has no intent or means to pose a dangerous threat. Since no person is named as being the subject of any dangerousness, the government must be inferring that Mario threatens all of Earth's corrupt politicians with jail, trial, and sentence, and that his Second Amendment beliefs are now weapons after the FBI seized his firearms on August 2, 2023. Mario must have superpowers and a secret Marvel comic book Justice League of his own to fight evil corruption and to bring truth and justice for all as Superman did. Mr. Mares never harmed anyone. Despite

no evidence, the government asserted that in the future Mr. Mares would be dangerous. Mr. Mares' detention in this case, which is based on fictional speculation and mischaracterization, violates the Bail Reform Act.

Not only did the government fail to show who was concretely in danger, it failed to show anything besides misrepresentation of and disagreement with Mr. Mares' opinions as expressed in his figurative speech about corrupt politicians and what he views as unconstitutional laws. The FBI's custodial interrogation of Mr. Mares on August 2, 2023 was the foundation for the government's position that Mr. Mares refuses to relent in his peaceful beliefs. Was he supposed to denounce the Second Amendment? It is unclear as to what will appease the DOJ. Any rational person can see hyperbole and figurative speech in Mario's almost three year old posts from a site that is longer on-line anywhere after being purchased and reinvented in March 2021. Any current reference to "hanging" corrupt politicians is based on potential treason and was stated as what *he thought should* happen. *He never said or meant that he would do anything.* There is a rather huge distinction when examining exact words that he used from what the government misinterpreted to the Texas court.

The government's misrepresentation of Mr. Mares' opinions is not close to being reasonable. He did not try to form a Texas vigilante posse. The government, in taking figurative words literally, hid the exculpatory evidence where the government's searches of Mario's family home, his business, and electronic devices uncovered no planning, no stash of rope, nor any identified hanging place. The government found nothing illegal or suspicious. Yet it claimed that Mr. Mares would violate release conditions and commit crime.

Mr. Mares did not stalk any politicians. He did not maintain their schedules and locations. Nobody can say with a straight face or believe that Mr. Mares intended to hang anyone. He used

a figure of speech, otherwise called "hyperbole," to vent. There was no arrest of Madonna when she said she wanted to blow up the White House (and President Trump by inference). There was no arrest of Kathy Griffin for creating and posting an image of her holding President Trump's bloodied, decapitated head. There was no arrest of Senator Waters after she told millions to get in the faces of Trump administration members and supporters and force them out of business establishments. Boxer turned actor Mickey Rourke was not arrested for saying about President Trump that he wanted "30 seconds in a room with the little bitch." Comedy Central's Larry Wilmore was not arrested for saying he wanted the pillow that was used to kill Justice Scalia and he would use it on Trump - with his words "not a euphemism" - and that he "meant it literally." Actor Johnny Depp was not arrested after he asked the audience at a music and arts festival "when was the last time an actor assassinated a president?" None of the music group Pearl Jam were arrested for distributing a poster for a concert that showed a bald eagle picking up the corpse of President Trump from the White House lawn. Actor Robert DeNiro was not arrested after he said he wanted to punch Trump in the face, and then at the Tony awards said "F*** Trump." These samples are just from 2017 and 2018, without named rappers and threatening, obscene lyrics.

The government claimed that Mr. Mares "doubled down" on his beliefs about gun laws. Apparently the Defense in Texas was not given the audio of the interrogation to be able to strongly and completely argue at the bond hearing that Mr. Mares' words were misrepresented. The government goaded Mario into stating opinions in a custodial interrogation apparently geared to find anything that could be used to deny bond. But the government downplayed in court that Mario uncontrovertibly said he did not carry a handgun in D.C. on January 6th before being lured into a philosophical discussion during custodial interrogation. The government omitted what Mr. Mares did do after January 6, 2021. He applied for and entered a police training academy. He respects

honest law enforcement. He respects the rule of law. He does not like corruption by politicians or police. His actions and demonstrated intent are 180 degrees out from the picture the government falsely painted of him. His beliefs are not irrational, illegal, or dangerous.

The government said that Mr. Mares' expression of his belief about the Second Amendment was "doubling down." Nothing is wrong with reaffirming a belief about what should be interpretated and followed according to the U.S. Constitution when that belief comprises no credible, actionable threat to anyone. His belief upholds the Second Amendment that protects Americans from being the unarmed Israeli's who were slaughtered and butchered by Hamas this past October 7th. His disagreement with states' laws that prevent open carry for defense is not an allowable reason under the Act to presume he will not follow release conditions and to incarcerate him. Mr. Mares never said that he would violate the law or attempt to do so.

Mario never violated any law about firearm possession. The government showed no credible evidence that he ever violated any law. After being mischaracterized at the bond hearing, Mr. Mares is in jail because of a protected First Amendment belief that people should be allowed to "open carry" a firearm for defense in most places. Because of that belief, the magistrate unjustly presumed guilt for the January 6th conduct charged, and said Mr. Mares would not abide by release conditions. He denied bond for "opinion crime" with no showing of dangerousness by evidence.

Mr. Mares is on friendly terms with his local law enforcement. He is not at odds with law enforcement. He does not have any history of arguments or combative behavior with law enforcement. When the FBI interviewer on March 31, 2021 asked Mr. Mares to disarm, he took his handgun to his truck when he did not have to do so. The FBI interviewer was certainly armed, and Mr. Mares did not ask him to take his weapon outside. Mr. Mares may not agree with requirements to obtain a permit for concealed carry, but he complied with the law and process. Mr.

Mares is in jail for government fabricated "opinion crime" where the government's false assertion seems to be an enactment of the movie "*Minority Report*."[6] The government has not identified where its clairvoyance comes from that legitimizes declaring Mr. Mares to be a future criminal.

Clear and convincing evidence is a "heightened standard of proof under which the fact finder must "give the benefit of the doubt to the defendant," *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994); *see Addington v. Texas*, 441 U.S. 418, 424 (1979). Mr. Mares received no benefit of the doubt when he was presumed guilty by the magistrate of illegally carrying a firearm in D.C. because the government contrived the fiction that his "spare tire" in three distinct body locations was instead a single handgun concealed under his clothes.  Mario received no benefit of the doubt when the magistrate declared he would not comply with any release conditions. While almost all other defendants who allegedly carried firearms or dangerous weapons at the U.S. Capitol on January 6th were released on bond, Mr. Mares was incarcerated.

The magistrate discussed the subsections of § 3142(g) at the detention hearing. In every category that he identified as important he stated that the overall outcome was favorable to Mr. Mares. Using the Act's statutory factors in § 3142(g), there was and is no evidence that supports an assessment of dangerousness for Mr. Mares. There were no substantive, credible facts to show "that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *Munchel*, 991 F.3d at 1279-80. Mr. Mares never went to his state's capitol to engage with politicians; he did not join a militia; and he did not espouse overthrow of the government by violence for the thirty-three months after January

---

[6] The film is based in D.C. in 2054. The government runs a "Precrime" police program where alleged clairvoyants ("precogs") identify those who are going to commit future crimes. The persons accused are imprisoned and placed in comas. The "precogs group mind" was not infallible.

6, 2021. He never said that he intended to interfere with the Electoral count. Instead, his actions show that he intended to join law enforcement to support the rule of law.

The government did not admit to the court or Defense that the search of Mr. Mares' home and business turned up nothing to show he possessed any illegal firearms or was engaged in any illicit activity. He has never been engaged in any of the Act's activities that fall under the rebuttable presumption. None of the abusive domestic terrorism searches showed any indicia of illegal activity, such as running an illegal drug network or funding terrorists. His social media posts from his few accounts that are no longer active are almost three years old. Not a single post was a precursor to violence. The almost three-year-old posts show one view for two posts, with another post having the non-grand influencer total of 9 views. TX Memo, ECF No. 14 at 5-7.

Because it had no evidence, the government showed an irrelevant "Three Percenter" decal on Mr. Mares' truck in its memorandum when that is not representative of dangerousness or any call to violence. It was shown purely to create prejudice. Since 2019, media and left leaning organizations have mischaracterized "Three Percenters" as a hate group. Any google search will bring to the forefront all the biased articles that mischaracterize people who follow the beliefs. "Three Percenters" believe that for the American Revolution, only three per cent of the Colonists took up arms. They are not a national militia, not white supremacists, not calling for civil war, and not a "club" despite the fictional creations of media, the Southern Poverty Law Center, and FBI propaganda to justify its funding for the Joint Terrorism Task Forces by using American conservative "targets." The government lacked evidence so instead it pointed to propaganda about Three Percenters to create a damning, false impression. In 2018, the group's website allegedly said, "Three Percenters are pro-government as long as those in government abide by the

Constitution: 'We do not seek to incite a revolution.'" [7] Also on the website was a purpose, "to reign in an overreaching government and push back against tyranny."[8] Mr. Mares is not a member of any Three Percenter group or any militia, should that be deemed illegal in the government's *Minority Report* dystopian activities and claims.

With no criminal history and no history of violating any gun laws, and no § 3142(g) factor providing any clear and convincing evidence of dangerousness, the magistrate declared that for an order to not possess a firearm, "I'm not reasonably assured that it will be followed." Bond Transcript, 67:5-6. That is not the proper standard. The standard is that "pursuant to subsection (e) [findings] that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142. The magistrate does not need to be reasonably assured. Release conditions do not need to provide 100% assurance. There was never a finding of dangerousness as required. There was no clear and convincing evidence. And the magistrate did not explain and did not write why every possible release condition on Earth could not reasonably assure public safety. As decided in this Circuit's oft cited case, "while the District Court stated that it was not satisfied that either appellant would comply with release conditions, that finding, as noted above, does not obviate a proper dangerousness determination to justify detention." *Munchel*, 991 F.3d 1273, 1284. In this case, the magistrate found no dangerousness after § 3142(g) examination, and should have moved directly to release conditions under § 3142(c). Instead, Mr. Mares was unjustly jailed for "opinion crime."

One opinion that is unacceptable to the government is that Mr. Mares believes that corrupt politicians ought to be removed from office and prosecuted. He *never said that he would take*

---

[7]  USA Today, "Three Percenters: What is the gun-toting group? And what do its supporters want?" by Josh Hafner, March 1, 2018. https://www.usatoday.com/story/news/nation-now/2018/03/01/three-percenters-what-gun-toting-group-and-what-do-its-supporters-want/385463002/
[8] *Id.*

*action* to make anything happen; *he said it should happen*. He used figurative speech to say "they" should be strung up. Then when interrogated, Mario said he did not agree with states' gun laws that did not allow carry in most places. It isn't clear if Mr. Mares must attend a reeducation camp to appease the DOJ even though **he presented no concrete, continuing danger to anyone.**

Before *Munchel* this Circuit highlighted that, **"**In light of the importance of the interests of the defendant that are implicated in a pretrial detention hearing, the 'danger to the community' determination must be supported by clear and convincing evidence." *United States v. Alatishe*, 768 F.2d 364, 370 (D.C. Cir. 1985). The Court held that "A judge's finding under Section 3142(e) that no condition or combination of conditions will reasonably assure the appearance of the person and the safety of any other person and the community **must be based on specific facts**." *Id.* 768 F.2d. By English language definition, clairvoyant visions do not equal facts. No facts were presented.

Because the government's arguments and magistrate's finding alleged that he would not comply with release conditions where no dangerousness as required by the Act was first identified, without facts showing clear and convincing evidence that Mr. Mares would violate the condition of not possessing a firearm, Mr. Mares must be released.

### B. Mr. Mares Should be Released Based on the Act's Section 3142(g) Assessment

18 U.S.C. § 3142(g)(1)-(4) contain what the Court is to assess by evidence and facts to determine dangerousness and whether to proceed to release conditions. This Circuit's *Chrestman* six advisory "guideposts" articulated in *United States v. Chrestman*, No. 21-mj-218 (ZMF), 2021 WL 765662 (D.D.C. Feb 26, 2021) for assessing the comparative culpability of a given defendant in relation to others on January 6, 2021 are considered as part of the nature and circumstances of the offense charged under § 3142(g)(1).

   **(1)  The nature and circumstances of the offense charged, including *Chrestman* factors favor release for Mr. Mares**:

   (a) Mr. Mares is charged with felony offenses because of the imagined handgun that he did not possess on the Capitol grounds. The charges are serious but involve no violence. He did not see any restricted area signs, saw nothing to indicate the area with thousands of people was closed, was given no dispersal order, and was not sprayed with gas or shot at by law enforcement. He did not cross any police lines, assault anyone, or encourage any violence.

   (b) Mr. Mares "planning" for the D.C. trip can only be described as having no plan. He did not finally decide to go until early on January 4, 2021. He made no hotel reservations and only planned to not stay in D.C. Mr. Mares planned to attend the Ellipse rally. He did not even have a parking destination point in D.C. He did not plan to go to the U.S. Capitol. He did not attempt to enter the building. He did not wear tactical clothing, bring a gas mask, or wear a helmet.

   (c) Mr. Mares did not carry or use a dangerous weapon. His hands were empty, and he wore gloves to keep his hands warm in the cold. He did not prepare for violent engagement anywhere. He always carries his emergency medical kit in the event anyone nearby is injured.

   (d) Mr. Mares did nothing to prepare, plan, or engage with anyone to breach the grounds or building. He did not attempt to go in the building. Nobody discussed going inside. He was separated from Subjects 1 and 2 but they did not previously mention going inside. Mr. Mares never expected to be at the Capitol grounds.

   (e) Mr. Mares had no leadership role and no role regarding actions by others. He did not encourage anyone to be violent or to violate any law.

   (f) Mr. Mares crossed no police line and did not come into contact with any law enforcement officers. He did not "breach" any fencing or barriers, and did not touch any manned barriers to interfere with police.  He only went where he believed he had a legal right to be present

for First Amendment speech. He did not livestream. He did not send messages glorifying the violence that he learned of later. He didn't try to push his way anywhere. He said nothing about disruption of the counting of the Electoral College votes. He threatened nobody and was 100% peaceful on January 6, 2021.

Comparatively assessing, Mr. Mares should be released. The large majority of other January 6 defendants accused of assaults and violent breaches, and those not accused of violence (or conspiracy or sedition) were released under the Act while he is jailed.

**(2)  The weight of the evidence is so weak it favors Mr. Mares release**:

The magistrate noted that this factor usually favors the government after its months or years to prepare charges. He said this is normally not an important decision factor and the defendant is presumed innocent. Bond Transcript at 62:17-23. However, that the government misrepresented facts and hid impeachment evidence concerning sources shows  that the weight of the government's evidence is so weak it has to use deception. This factor favors Mr. Mares.

A good deal of the "evidence" in the government's Texas hearing memorandum, ECF No. 14, is about Subject 1. Subject 1 arranged items for the picture he posted on Facebook labeled "F*** Washington, D.C." The luggage cart bag loading pictures are for Subjects 1 and 2. Subjects 1 and 2 were in cahoots with whatever caused them to remove their luggage from their rooms on the morning of January 6, 2021 when the rooms were reserved for that night.

The government misrepresents times for pictures. It shows Figure 11 with the timestamp purposely removed to make it appear the picture in Figure 11 was taken after Figure 10. There is no visible handgun as the government alleges, but in arguendo if there were, Figure 11 was before the times of Figures 9 -10 and if Mr. Mares has been wearing a hip holster, this is a time where he

can have secured the handgun in his room when Subjects 1 and 2 were not present. However, the government misrepresents Mr. Mares' medical aid kit edge as a handgun. TX Memo ECF 14 at 12.

The government circled body areas in Figures 11 and 13-16 where it is physically impossible that a handgun in a holster was present at any individual location and certainly not in all locations simultaneously. Figure 14 shows the aid kit that earlier it declared was a handgun. The camouflage pattern is falsely called a handgun. It is impossible that the bottom of the holster would have been hidden if placed forward of the medical aid kit where a hip holster would be positioned. The camouflage tree branch is called a handgun. TX Memo ECF No. 14 at 14. Then magically in Figures 13 and 16 a small handgun is alleged to be riding well above the waist. The entire allegation is a stretch of a vivid imagination and is less than weak.

As highlighted in the facts section *supra*, the government altered all videos - inside and outside - to include spoliating time and the evidence overall. Fifteen minute indoor videos as bookmarked from starting point to end point of imbedded camera times are somehow only eight to nine minutes of run time. Outdoor fifteen minute videos as bookmarked from start to end point imbedded camera times are eighteen minutes of run time. Aside from causing untold extra hours of video review to find relevant activity, none of the times can be considered true. Incredibly, Subject 1 arrived at his second-floor room with a luggage cart when according to the outdoor camera he did not return to the hotel until ten minutes or more later. These shenanigans are worthy of case dismissal or other sanctions. Defense had to expend needless hours trying to correlate video, segments are missing, the time stamps are unreliable, and the government's file label time bears no resemblance to the time alleged in the videos. See Exhibit 2. The government provided no video of the front desk. Is this another case where January 6th video lacks completeness and is altered so the government can hide its undercover agents and informants?

The government wrote in misrepresentation and in concealment of exculpatory evidence:

> Mares, Subject-1, and Subject-2 returned to the Fairfax, Virginia Comfort Inn around 6:00 PM EST on January 6, 2021. A witness observed the three men return to the Fairfax hotel that evening wearing body armor and smelling of tear gas. According to that witness, upon their return from the Capitol, the three men had firearms on their hips and unloaded a rifle carrying case from the bed of the pickup truck, inside which a rifle could be seen. That witness also observed two ammunition containers, similar to metal ammunition containers used by the military, and military-style backpacks in the bed of the pickup truck.

Texas ECF No. 14 at 17.

The above is problematic. Witness 1 was adamant that the three men he saw arrived between 7:30 p.m. and 8:30 p.m. **The above is misrepresentative because it infers that Witness 1 saw Mr. Mares around 6:00 p.m. It excluded the exculpatory evidence that Witness 1 was talking about three completely different people.** (Witness 1, Redacted Form 302 in "protected" discovery). **The government also omitted the exculpatory statement by Witness 2 that he only saw Subjects 1 and 2 wearing body armor.** (Witness 2, redacted Form 302).

The video spoliation makes it impossible to confirm what three men arrived between 7:30 and 8:30 p.m. in a truck. Mr. Mares was not exposed to O/C or other tear gas and did not smell any gas on Subjects 1 and 2 when they returned to Virginia from D.C.

The picture in TX Memo, ECF No. 14 at 18 shows only two tactical vests. Mr. Mares did not own such a vest on January 6, 2021. But, to confuse, the government included a picture from the search of Mr. Mares' home. ECF No. 14, Figure 29 at 23. The receipt for the purchase of this item - well after January 6, 2021 is at the Exhibit 3. Mr. Mares purchased the vest when he was planning to complete the police academy and work with the local sheriffs. In the same light, the government stuffs square pegs in round holes trying to show that Mr. Mares owned containers similar to ammo boxes when the government knew that Witness 1 saw different people and a

different truck. Mr. Mares did not own the blue box shown in Figure 25 on January 6, 2021. TX Memo, ECF No. 14 at 21.

The government states that Subject 1's phone location showed he "arrived in Washington, D.C. at approximately 7:28 AM on January 6, 2021, that he travelled back into Northern Virginia sometime around 7:37 AM, and that, by 9:45 AM, he was back in Washington." TX Memo ECF No. 14 at 13. Since Mr. Mares parked his truck and never traveled back to Northern Virginia during this timeframe, the fact begs the question of who Subject 1 met and traveled with to Northern Virginia. Was it an agency handler? Or is the data completely wrong? Something is hidden from the Defense and Court. Mr. Mares' cannot be assumed to be in the geolocations as Subject 1 given that he did not leave the rally until after 1:15 p.m., while the Texas Memo says the three men left sometime around 12:15 pm. ECF No. 14 at 13-14. The government's evidence is so weak that it attributes what Subject 1 did to Mr. Mares. It makes up facts to mislead the reader to believe what Witness 1 saw other men doing was about Mr. Mares.

Regarding the imaginary handgun, there is no visible handgun on Mr. Mares' person. The government used the optical illusion of the camouflage shirt pattern to persuade an observer that there is a handgun hidden underneath. The government circled at least three different body locations (Mr. Mares' right-front belly, his right hip, and his back) expecting an observer to overlook the physical impossibility of a gun being at all three locations simultaneously. In Texas ECF No. 14 at 12 the government knowingly circled the edge of Mr. Mares' medical aid kit that was positioned on his back and said it was a handgun.

**This factor favors Mr. Mares because the government's evidence collapses under scrutiny**.

**(3)  The history and characteristics of Mr. Mares favor his release:**

Mr. Mares is an America-loving Christian who has unfairly been torn from his soulmate. He has known his loving wife since they were children and then high school sweethearts. They have been happily married for 20 years. They are both respected in the community. Mario is a hard worker who built up his own welding business and is known for quality work. He works Mondays through Saturdays. Mrs. Mares has a job that required bonding and honesty.

Mr. Mares is from a modest background. Although he does not advertise it, he is of Hispanic roots and more recently learned that his aunt's DNA test showed native American heritage. His father worked in the Texas oil fields and although the family moved a few times in the south Texas region he comes from a stable background. He is a hard worker who often worked multiple jobs to reach a middle class status. He explored and tried employment and business options to see where he could excel and be happy. After high school he worked as a produce manager and then went to trade school. He was licensed and worked for Citicorp financial services from approximately 2001 - 2015. In the late 1990's he joined with his father in establishing a trucking company. He continues part-time, long term care insurance sales and consults on debt reduction. He was a correctional officer for a few years. The trucking business experienced hard times due to financial crashes from the late 1990's into 2008. He restarted the trucking business in the 2010-2012 period and has since owned different semi-trucks. He donated his time and used his truck to pull a tractor load of supplies donated by his hometown to hard-hit hurricane areas. He started a welding company around 2012. He also runs a rural area lube and tire service. Whenever he is required to have a permit, he follows the law.

He has no criminal or violent history and is no threat to anyone. He has been referred to in his community as "the Second Amendment guy." Despite business hits due to Covid-19

lockdowns, he persevered. He and his wife live within their means and are responsible people. They are respected in the community. See Support Letters at Exhibit 1.

Mr. Mares consented readily during his March 31, 2021 interview with the FBI to place his handgun outside. When his home was raided on August 2, 2023 he peacefully surrendered, as confirmed by the FBI witness:

> Q. Okay. So upon announcing that they were law enforcement,
> did Mario surrender himself to them?
> A. Yes, sir, he did.

Bond Hearing Transcript, 12:10-12

> Q. As soon as he knew they were law enforcement, he cooperated
> with them?
> A. Yes, sir.

Id. at 17-19.

Mr. Mares is rooted in his community. The love of his life, his family, his home, his friends, and his business are in his Texas hometown. He has no means or mode of fleeing; and nor would he try. He poses no danger to anyone. He lived peaceably his whole life and certainly for the thirty-three months after January 6, 2021. Because he is not a flight risk, poses no threat to anyone, there is zero hint of dangerousness, and he is law-abiding, Mr. Mares should be released.

### D. Mr. Mares Should be Released on His Own Recognizance Where Other Least Restrictive Release Conditions Can Alleviate and Mitigate Any Concerns About Risk

The government cannot prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Munchel* , 991 F.3d 1273, 1279–80 (quoting § 3142(f)). The government identified no threatened group or person. Mr. Mares is a danger to nobody. Although he should be released without conditions, Mr. Mares will accept conditions ordered by this court to assuage any concerns that might linger after the government's weak case and lack of evidence.

In addition to the mandatory conditions for release at the top of AO 199A as required by the Act, the standard release conditions used in this Court include: an order to stay out of D.C. except for court requirements; comply with courtesy [N.D. TX] Pretrial Services supervision; no travel outside the home district without prior notification of Pretrial Services; no travel outside the continental U.S. without approval of this Court; not possess a firearm; maintain or seek employment; surrender any passport; and do not use any illegal substances, with the added condition of an unsecured signature appearance bond. Both Mr. and Mrs. Mares respectfully ask this Court in its decision for release conditions to consider his ability to work, to not lose his business, and to continue forward as the primary breadwinner for the family. Mrs. Mares is employed but her salary is not sufficient to cover the normal family expenses, nor the rent and other expenses to keep Mr. Mares' welding business afloat. Mr. Mares' usually works six days a week, and his rented space for his shop that holds all his equipment is approximately eight to nine miles from home.

Mr. Mares is not alleged to have committed any crime at night and is not a flight risk, and a curfew would not serve as a least restrictive condition. He often performs welding work in rural farm areas where his end of workday and home arrival time is at night. He is not a flight risk so high intensity GPS monitoring by ankle bracelet would not serve as a least restrictive condition. The ankle bracelet can prove dangerous given that in his welding work he climbs on or maneuvers around equipment that the bracelet can get caught on and cause serious leg injury. When he travels across the county to local farms for welding work, cell service may not be available, and the GPS connection may not function properly (including inside metal barns and buildings). The wear of an ankle bracelet will not serve a legitimate function but will instead disrupt work where he will receive demands when in a cellular connection black hole to go stand outside for thirty or more

minutes to reestablish a GPS connection. If the Court has concern that he might leave his district without Pretrial Services notification, it can require daily calls or texts to his supervising officer where he drops a location pin.

Any concern about firearms is alleviated by the fact that the FBI took all of Mr. Mares' firearms. Courts impose the "no firearms" condition because Pretrial Services officers do not want to visit when firearms are on the premises and available to the "presumed innocent" defendants. This is harsh for those who live in isolated, rural areas but Mr. Mares understands that this is what it is and will comply. The FBI left his wife her handgun for protection. She can secure that where Mr. Mares has no access and will never be able to assume dominion over it. There is no reason to take away her protection as long as Mr. Mares' has no access. She confirms this will be the case.

If the Court does not want to release Mr. Mares on his own recognizance, both Mrs. and Mr. Mares request that he be released in Mrs. Mares' custody. She will ensure he attends all Court appearances and abides by all release conditions. Mrs. Mares is of outstanding character with no criminal history. She follows the law. There is nothing about her character or reputation in the community to suggest she will not do her duty as entrusted by this Court.

Since there may be a local witness, the Court may consider ordering that Mr. Mares not contact, not speak to, not speak publicly about, nor have any conversation with any known witness. Given that it is a small town America, the vague term of "avoiding" is likely impossible to achieve for either party. Grocery and welding supply stores, restaurants, and banks as examples are limited. The Court should fairly order that witness /subject (if on a sealed docket) make no contact, not speak to, not speak publicly about, nor attempt to have any conversation with Mr. Mares. There is no threat from Mr. Mares except in the peaceful form of his trial bringing out the truth concerning false accusers if this Court does not dismiss this case before a trial.

The Court can add any condition it considers necessary and least restrictive to reasonably assure Mr. Mares appears as required and is not a threat to the community.

## V.        CONCLUSION

Release is warranted in this case. First, the Government ceded any argument that Mr. Mares is a risk of flight. Second, the Government fails to meet its burden to show clear and convincing evidence that Mr. Mares is a concrete, continuing danger to any other person or the community. Third, in the event that this Court somehow finds the Government -- through its proffer and a sprinkling of stale social media posts; short, spoliated video clips, claims that body fat is a handgun; and Mr. Mares' beliefs – has met its burden, the analysis mandated by the Bail Reform Act does not end. The Government still bears the burden of proving to this Court that there are ***no conditions, or combinations of conditions***, which will reasonably assure the appearance of Mr. Mares and the safety of any other person or the community. At each step, the Government fails to meet its burden.

Wherefore, because Mr. Mares does not pose a danger to any person, and has always complied with the law including the thirty-three month period after January 6, 2021 where nobody indicated he was dangerous, and for good cause shown, the Court should revoke the magistrate's order and use the December 1, 2023 hearing to decide on conditions and release Mr. Mares.

Dated November 11, 2023                    Respectfully submitted,

                                           /s/ *Carolyn A. Stewart*
                                           Carolyn A. Stewart, Bar No. FL-0098
                                           Defense Attorney
                                           Stewart Country Law PA
                                           1204 Swilley Rd.
                                           Plant City, FL 33567
                                           Tel: (813) 659-5178
                                           Email: Carolstewart_esq@protonmail.com

**CERTIFICATE OF SERVICE**

I hereby certify on the 11th day of November, 2023, a copy of the foregoing was served

upon all parties as forwarded through the Electronic Case Filing (ECF) System.

                    /s/ Carolyn Stewart
                    Carolyn Stewart, Esq.