UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       .
                                .
            Plaintiff,          .   CR No. 23-0252 (ACR)
                                .
       v.                       .
                                .
MARIO MARES,                    .   Washington, D.C.
                                .   Wednesday, November 15, 2023
            Defendant.          .   2:46 p.m.
. . . . . . . . . . . . . . .   .

BOND REVIEW HEARING
BEFORE THE HONORABLE ANA C. REYES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:             KATHERINE E. BOYLES, AUSA
                                U.S. Attorney's Office
                                157 Church Street
                                25th Floor
                                New Haven, CT 06510

                                RYAN SELLINGER, AUSA
                                U.S. Attorney's Office
                                601 D Street NW
                                Washington, DC 20530

For Defendant:                  CAROLYN STEWART, ESQ.
                                1204 Swilley Road
                                Plant City, FL 33567

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue NW
                                Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                     P R O C E E D I N G S

2                     (Via Teleconference)

3           THE DEPUTY CLERK:  Criminal action 23-252,

4     United States of America versus Mario Mares.  Would the

5     parties please identify themselves for the record.

6           MS. BOYLES:  Good afternoon, Your Honor.  AUSA

7     Katherine Boyles on behalf of the United States, and with

8     me on the line is AUSA Ryan Sellinger.

9           MR. SELLINGER:  Good afternoon, Your Honor.

10          THE COURT:  Ms. Boyles, have we met?

11          MS. BOYLES:  Yes, we have, Your Honor.

12          THE COURT:  Which case?

13          MS. BOYLES:  I've been before you, along with AUSA

14    Sellinger, in two sealed matters.

15          THE COURT:  Okay.  Welcome back.  Good afternoon.

16          MS. BOYLES:  Thank you.

17          THE COURT:  For the defense?

18          MS. STEWART:  Yes, Your Honor.  This is Carolyn Stewart

19    for the defendant, Mario Mares.

20          THE COURT:  Okay.  So the reason I got us all on the

21    phone is because I've been looking at the Bail Reform Act

22    motion.

23       And, Ms. Stewart, just to start, you're got going

24    to get anywhere with me by claiming repeatedly that this

25    guy is being prosecuted because of his free-speech rights.

1    He's being prosecuted because he's been indicted by a grand

2    jury for violating the law.  So I don't want to hear that

3    going forward, but the actual substance of your motion is

4    actually quite a good one.  And I'm worried that maybe I'm

5    missing something, so I wanted to get us all on the phone

6    before an evidentiary hearing.

7        As far as I can tell, Mr. Mares has no criminal history

8    background at all and no indicia of violence.  Is that correct?

9        Is that correct, Ms. Boyles?

10           MS. BOYLES:  Yes, Your Honor.  No criminal history.

11           THE COURT:  Okay.  And then he was arrested in August

12   of 2023?

13           MS. BOYLES:  Yes, Your Honor.

14           THE COURT:  So about two and a half months after --

15   two years and six months after January 6?

16           MS. BOYLES:  That's correct.

17           THE COURT:  And there was nothing that occurred during

18   that time period?  He is not subject to any crime, he hasn't

19   been accused of any violence, he hasn't posted threats to

20   people, to your knowledge?

21           MS. BOYLES:  Your Honor, there are some issues that

22   we've raised initially before the magistrate judge in Texas

23   regarding concerns about potential violence, but there's not

24   been an example or instance of actual violence.

25           THE COURT:  Right.  Yeah, yeah.  Okay.  I just want

1  to make sure I understand everything so we're all on the same

2  page here.  All right.  So for two and a half years, he was

3  out and nothing happened so far as we're aware.

4       MS. BOYLES:  That's correct, Your Honor.  He did make

5  statements upon his arrest to the FBI that were particularly

6  concerning, but nothing else that we're aware of beyond those

7  statements.

8       THE COURT:  Yeah, yeah, I know, but we're going to

9  go through those statements.  And with respect to the FBI

10 statements, basically the concern is -- I'm just looking at

11 the -- sorry -- just looking for the actual statements here.

12    One of the statements that he made to the FBI that you're

13 concerned about is that he said he did not bring a firearm

14 into D.C., but, if he had, it would have been his lawful right

15 to do so.  Right?

16      MS. BOYLES:  Yes, Your Honor.

17      THE COURT:  Okay.  I mean, I was just having a

18 conversation with my clerk.  I don't even know whether it

19 would have been illegal for him to bring a firearm into the

20 District at that time period, given Supreme Court cases.  I

21 mean, I know that D.C. just a couple of months ago settled

22 with people who were convicted and put in prison for violating

23 the firearms statute here and they were freed because of the

24 most recent Supreme Court opinion, and then after that they

25 sued and D.C. settled for $5 million.  So I don't know about

1    whether it was obvious that he could or could not bring a

2    firearm into D.C. given current case law.  And I'm sure

3    there's an answer to that, but his view that he had a lawful

4    right to do so doesn't seem particularly troublesome.

5         I mean, he said, "I have a constitutional right to bear

6    arms no matter what."  Now, obviously, that's a broad reading

7    of the Second Amendment, probably some people might be

8    perfectly happy with it, but I'm not sure that that indicates

9    that he's going to commit violence.  And then --

10            MS. BOYLES:  Yes --

11            THE COURT:  Go ahead.  Respond to that if you want.

12            MS. BOYLES:  Yeah.  All I was going to say was my

13   understanding of the detention hearing that proceeded in Texas

14   is that the magistrate there was concerned that the defendant

15   would not follow conditions that had been set.  And so the

16   suggestion --

17            THE COURT:  Yeah, I read the whole -- yes, I read the

18   whole transcript, Ms. Boyles.  I read the whole transcript.

19   And the reason I'm going through this is because I read the

20   transcript and I don't understand how he came to the decision

21   he made.  I mean, there was no -- well, let me just go through

22   it so we're all on the same page.  I just want to keep doing

23   what I'm doing.

24        So we have that FBI statement, and then we have the second

25   FBI statement.

1        FBI says: "Do you think we're at a point where we're
2    ready for another revolution, yes or no?"
3        And he says: "This country has come to somewhere where
4    everybody needs to look at it and say what are we doing.
5    And like I said, if you -- the law and everybody's good,
6    it's good.  But when you cross that line of tyranny, man,
7    yes.  You should be strung up like in the old days and hung
8    for tyranny."
9        FBI:  "You feel strongly about that."
10       Mares:  "I mean, if you're corrupt, yes."
11       I mean, that's obviously not ideal, but that's -- you
12    know, that's a flag, essentially.  I'm not sure if it's a red
13    flag; maybe it's a yellow flag.  He owns a bunch of guns and
14    rifles, apparently.  It's beyond me why people buy so many
15    rifles and guns, but they do have a constitutional right to
16    do so.
17       And, so far as I'm aware, there's no assertion that any of
18    these guns that he's been associated with he had without a
19    permit or was somehow carrying illegally, putting aside carrying
20    them into the Capitol, right?
21            MS. BOYLES:  So they were illegal to carry into the
22    Capitol.  There's no --
23            THE COURT:  Yeah, yeah.  Of course.
24            MS. BOYLES:  -- them illegally outside of D.C.  Under
25    Texas law, he was abiding by Texas law.

1          THE COURT:  Okay.  So when he had all these guns in

2     Texas, he was abiding by Texas law.

3          MS. BOYLES:  Yes, Your Honor.

4          THE COURT:  Okay.  All right.  And so then we get

5     to what I guess is really the heart of the matter, unless

6     I'm missing something, which is these posts that he made,

7     which, Ms. Stewart, I mean, they are pretty troubling.

8       So he has a post on December 27, 2020:  "I believe that

9     every #patriot should on January 6 if you can't make it to DC

10    you should go to your state capitol and local mayors offices

11    heavily armed and drag out and either jail or execute all the

12    known CORRUPT #politicians for treason!"

13      I mean, that's pretty bad, Ms. Stewart.

14         MS. STEWART:  Yes, Your Honor, but --

15         THE COURT:  I'm not -- I haven't asked you to speak

16    yet.  You will have your time.

17         MS. STEWART:  Oh, okay.

18         THE COURT:  I just want to get through this.

19         MS. STEWART:  All right.  Thank you.  Okay.

20         THE COURT:  And then we have another post on Christmas

21    Eve; I guess he wasn't out Christmas shopping.

22      He has: "Fuckin #Pelosi, you are not pulling anyone out of

23    the Whitehouse by their hair" -- blah, blah, blah, blah, blah,

24    lots of "f" word, lots of "f" word -- "WE ARE GOING TO FIND YOU

25    AND WE THE PEOPLE WITH NO MERCY ARE GOING TO HANG OR EXECUTE

1  YOU!!! WE HAVE HAD ENOUGH!!  YOU BETTER HOPE TRUMP FINDS YOU

2  FIRST!!!"

3      Okay.  So, obviously, that's pretty bad.

4      And then on Christmas -- ironic, Ms. Stewart, given that

5  apparently your client, based on all the letters I've read,

6  is quite the devout Christian.  I don't know how Jesus would

7  feel about threatening to kill and execute people but, you know,

8  to each his own, I guess.

9      All right.  So on December 25th we have: "Time to start

10  the LYNCHING party!! #PATRIOTS coming for you corrupt

11  #politicians."

12      So, Ms. Boyles, those are the three tweets that I am aware

13  of where there's actual -- or social media posts where there

14  are actual threats of violence.  Am I missing anything else?

15          MS. BOYLES:  No, you're not, Your Honor.  Thank you.

16          THE COURT:  Okay.  And these happened before January 6,

17  so before he was at the Capitol.

18          MS. BOYLES:  Yes, Your Honor.

19          THE COURT:  Okay.  And when he was at the Capitol,

20  he was apparently there for about two hours.  And there's an

21  allegation that he was carrying a gun, and the grand jury did

22  indict him on that offense; but there's no allegation that he

23  participated in any violence himself, right?  You all say that

24  he was in an area where there was violence and he should have

25  been aware of it, but there's no allegation that he engaged in

1    any violence.  Correct?

2              MS. BOYLES:  That's right, Your Honor.

3              THE COURT:  Okay.  And then, again, two and a half

4    years go by and he hasn't executed -- or tried to execute or

5    carried out on any of these social media threats.  Right?

6              MS. BOYLES:  That's correct.

7              THE COURT:  Okay.  And then what I've got are about 15

8    support letters -- were these support letters in front of the

9    magistrate?

10             MS. STEWART:  Your Honor, there was only, I think,

11   two of them and the person was there, the justice of the

12   peace; and then another person, Plummer, either a letter or in

13   person; and then also his wife.  I don't know if the defense

14   submitted all of the other support letters.  I'm not sure that

15   they did.  I think they just relied on those three people

16   representing the community.

17             THE COURT:  All right.  Well, so, Ms. Boyles, I don't

18   know if you had a chance to look at these letters, but I got

19   a letter from his wife, obviously, a law enforcement official,

20   a business person, a bank CEO, his bank teller, an assistant

21   pastor, a farmer, a number of people who have worked together

22   both on farm, welding, and financial industries.

23     I've had people who've known him for over 20 years, in

24   some cases I think 23 to 25 years, and all of them say the

25   same thing, which he's a law-abiding citizen, has never to

their knowledge, other than of course the allegations with
respect to January 6, ever violated the law, they all would
feel very comfortable with him in a small town, and none of
them have ever seen any indicia of violence.  He also
apparently has contributed mightily to his community including
through something as simple as volunteer work.

So I guess my question, Ms. Boyles, is -- I mean, I guess
that these social media posts are pretty bad, but nothing
before or after those posts support that he's not a law-
abiding citizen.

And the reason -- I don't want to put you on the spot,
because I know if you want one you're going to have an
evidentiary hearing, but first -- and I know that my court
reporter has been working yeoman's hours to try to get
everyone out of hearing prior to -- I guess you guys finally
decided on a day on December 8, but I gotta to tell you,
unless I hear something dramatically different at that
evidentiary hearing other than these posts, or maybe the FBI's
going to convince me, I don't know, I mean, I don't see how I
could possibly keep this guy in jail.

And so I guess my question -- one of my questions is,
Ms. Boyles, in light of the fact that you now have all of
these letters, can the government -- does the government want
to rethink its position?  That's not a rhetorical question.
I mean, I think you should consider it.  If you want to put

1    the burden on me, I mean, I'll do it.  I have a job to do.

2        Secondly is, I don't want this guy in jail for another

3    three or four weeks because of scheduling issues if I do

4    decide to release him.  So what I would also like to do is

5    see if we can all figure out a way -- if you want, have an

6    evidentiary hearing -- get this done before December 8.

7        So, Ms. Boyles, I've said a lot, and I'm going to let you

8    talk.

9        MS. BOYLES:  I appreciate that, Your Honor.  So if I

10   could ask you just one question:  Have you been able to review

11   our motion for pretrial detention that was filed in Texas?

12          THE COURT:  I have.

13       MS. BOYLES:  Okay.  So I just wanted to make sure

14   that that was in front of you.

15       Your Honor, I think in this case the government is in

16   the position of being very concerned, obviously, about any

17   kind of violence happening in the Capitol, and the idea of

18   an individual coming into D.C. with weapons, knowing, as the

19   government alleges and the grand jury alleges, that he knew he

20   was not supposed to be carrying weapons, and then even on the

21   day of his arrest two and a half years later is still

22   maintaining that, no matter what, he could still bring weapons

23   into the Capitol, given some of the other posts and the text

24   messages that are also documented in our original filings,

25   which we did intend to supplement today -- I appreciate the

1    Court kind of cutting to the chase here.  Given all of that

2    background, we do maintain that it's appropriate to detain him

3    at this time given the potential for violence as well as the

4    concerns over whether or not he would abide by conditions.

5        Now, I do take the Court's point and appreciate the fact

6    that, with all this community support rallying behind him,

7    that is a point that the Court should consider and may be less

8    of a concern now that we have those letters and that we have

9    that documentation that the Texas magistrate judge did not

10   have the benefit of.

11       But, you know, at the end of the day, this is a case about

12   -- this is a case about coming to D.C., knowing that he was

13   violating the laws of D.C., and bringing in weapons that we

14   know exponentially increase the likelihood and the potential

15   for violence and what that violence looks like.

16       I don't have anything else to offer the Court today.  We

17   are still happy to file a responsive filing, but I understand

18   if the Court wishes to rule today.

19           THE COURT:  Oh, I'm not planning.  I mean, if you

20   guys want time to file, I'm not going to rule today.  I'm not

21   putting you on the spot that way.  I mean, I would love to

22   rule today, but I don't think that's fair to you all.

23       Ms. Stewart, can you explain these posts to me?  I mean,

24   so far as I can tell, the statements to the FBI and these

25   posts are the linchpins of why he was detained pretrial and --

1   I mean, they're not nothing.  I mean they're pretty bad.

2   Is there anything that you can do on those things?

3        MS. STEWART:  Well, I can, Your Honor.  Thank you.

4   You know -- and I'd like to start off with he made these posts,

5   but he did not bring weapons into D.C.  So I'll go back to the

6   posts.  He was, I would say, angry.

7     He was inundated -- and I'm not blaming social media.

8   He'll take responsibility for making very bad posts and being

9   ashamed and embarrassed of them.

10    First, he was on a platform with all of about 10 or 12

11  viewers.  So we can put that into perspective.  He was not on

12  Twitter; he was on Facebook.  He -- you know, somebody else

13  hacked into his account.  So he wasn't on those major platforms.

14    But he made those posts, and that's -- I think this is the

15  bad situation of what I'll call the "sewer" of social media,

16  where both sides and the middle are being riled up and wound up

17  by all of the different *this is happening*, *this is happening*,

18  with the different claims.

19    But he was hearing and seeing news, whether he has the radio

20  on when he's out doing his welding work or in the truck driving

21  between places, and he's hearing, you know, Nancy Pelosi say

22  "we're going to drag Trump out of the White House," and I think

23  as an American he found it very disconcerting to have members

24  of Congress threatening violence against the president.  And

25  two wrongs don't make a right, and he'll say that to this day.

1          He has no good excuse for those other than it angered him.

2    So that's the angriest anybody in the world has ever seen

3    Mr. Mares.  He's never picked up a weapon.  He's never hit

4    anybody.  I know the government keeps saying he brought them in

5    because they pointed at his, you know, body fat and called that

6    a weapon, and we'll deal with demonstrations to show that that's

7    actually impossible with putting a weapon under a shirt to show

8    is almost ludicrous --

9          THE COURT:  If you're going to do that, I suggest

10   you make sure that it's the exact same weapon that they're

11   alleging he had --

12         MS. STEWART:  Right.

13         THE COURT:  -- because otherwise they're going to

14   object.

15         MS. STEWART:  Right.

16         THE COURT:  But anyway, we'll get to that later.

17   All right.

18         MS. STEWART:  Right.  Right.

19         THE COURT:  Well, let me say this:

20     Ms. Boyles, I'm obviously going to let the government have

21   -- you have a right to oppose the motion, and you don't have

22   to answer today, but do you need an evidentiary hearing?

23   Because I don't need to hear from the wife.  I mean, I read

24   her testimony before.  I have her letter before me.  I have

25   letters that the magistrate didn't have.  If you want me to

1    hear from your FBI agent, I guess we can do that.

2        But if this would just save everyone time and energy

3    enough, we can do this on the papers.  But again, Ms. Boyles,

4    I just want to make clear that I'm going to give you all

5    whatever hearing you want, and you can maybe tell us tomorrow

6    what you want if you don't know right now.

7        MS. BOYLES:  Your Honor, at this point I would say --

8    I don't think that we need an evidentiary hearing.  Your Honor

9    has primarily the information that we were going to be

10   presenting in our opposition.  The government maintains that

11   detention is appropriate in this case.

12       However, if the Court wishes to rule on the current papers,

13   being the defense's motion that was filed here and our memo

14   that was filed in Texas that's filed here at docket entry 16,

15   Exhibit 4, we would rest on our original memo and are

16   comfortable with the Court ruling today.

17       THE COURT:  All right.  Terrific.  Thank you, Ms. Boyles.

18       So I am going to order his release.  I do think I need to

19   make some findings.  So we're going to write up a short order.

20   We will get that posted probably not until tomorrow, and I

21   will work with our probation people to figure out -- where is

22   he being held right now?

23       MS. STEWART:  Your Honor, he's in the D.C. jail, the

24   D.C. detention facility.  I think it's over on E Street, 19th.

25   It's in D.C.

1          THE COURT:  Okay.  Ms. Boyles, I am going to impose

2     conditions of probation.  Do you want to work together with

3     Ms. Stewart to get those to me what you want?  Ms. Stewart,

4     he's not going to be allowed anywhere near any kind of gun.

5     I'm talking not even a Nerf gun.  Are we clear?

6          MS. STEWART:  Yes, Your Honor.

7          MS. BOYLES:  Your Honor, I was just going to say,

8     I'm happy to work with Ms. Stewart on precise conditions, but

9     just to forecast for the Court, we would also be seeking very

10     strict conditions on any contact whatsoever with anyone who

11     may be a codefendant or a witness in this case.

12          THE COURT:  Yes.

13          MS. BOYLES:  I believe Mr. Mares understands who those

14     persons would be, and we want to make sure there is absolutely

15     no contact with those individuals.

16          THE COURT:  Yes.  I mean --

17          MS. STEWART:  Your Honor, if I may be heard --

18          THE COURT:  Sure.

19          MS. STEWART:  If I may be heard, you know, it is a

20     small-town America.  And I think I went through this in the

21     motion, but I think such an order, since this was done prior

22     to his knowledge, sealed with the other two codefendants in

23     this same case that they receive the order.  I don't think we

24     can say no contact, you know, where if they all -- there's one

25     restaurant, and they're all in there.  It's no talking, no

1    exchange of words, no calls.  I think we have to allow for the

2    fact that they may end up in the same grocery store at the

3    same time and just to ignore each other.

4        THE COURT:  All right.  Well, Ms. Boyles, draft some

5    language along those lines.

6        But, Ms. Stewart -- yeah.  She's going to get want she

7    wants, basically, because your guy is getting out of jail,

8    which is better than what he was going to have in the next

9    few weeks or months.

10       So, Ms. Boyles, if you want a no contact, just make sure

11   that she has, and we have, the exact people so there's no

12   dispute down the line that there was someone he didn't know

13   about --

14       MS. BOYLES:  Sure.

15       THE COURT:  -- that you all thought he should have

16   known about.

17       MS. BOYLES:  Yes, Your Honor.

18       THE COURT:  No firearms anywhere.  I'm going to find

19   the strictest no-firearm, whatever, I can find.

20       Pretrial Services?  Okay.  We're going to get -- we're

21   going to get Pretrial -- I'm going to figure out how to get

22   this done as quickly as possible to ensure that there are

23   conditions of release.

24       Ms. Stewart, please explain to your client that the

25   Second Amendment, while a cornerstone of our democracy, is not

1    without some limitations, including that I can put limitations

2    on him during pretrial probation, okay?

3         MS. STEWART:  Your Honor, absolutely no problem with

4    that.  Yes.

5         THE COURT:  Okay.  All right.  Ms. Boyles, thank you.

6    I appreciate your work.  Ms. Stewart, thank you.

7         MS. STEWART:  Your Honor, can I ask something before we

8    get into this?  And I explained this in the motion.  I know

9    the government all the time wants to put ankle bracelets and

10   all this other stuff.

11      Can we dispense with that ahead of time so that we can come

12   up with something reasonable, least restrictive?  I just -- I

13   just don't want to have that we're both coming in arguing and

14   the minds aren't going to meet.  He runs all over the county

15   working.  He's going to be out of GPS range.  He's going to be

16   in barns and metal buildings that the signal won't --

17        THE COURT:  I'm not putting him on home confinement,

18   so why would he have an ankle bracelet?

19        MS. STEWART:  Exactly.  That's my point.

20        MS. BOYLES:  Your Honor, we do typically, in cases like

21   this, ask for electronic monitoring, not that that would keep

22   him within home detention situations, that that would give

23   authorities the ability to locate him if there were to be any

24   kind of issue.

25        THE COURT:  All right.  Well, I don't think that's

1   necessary here, Ms. Boyles.  I mean, look.  My guess is, given

2   where he lives, if you wanted to find out where he was, you

3   would know in about 10 minutes.  And if he's gonna flee --

4   you know, given everything I have in front of me, I can't

5   imagine that he's going to flee, but if you feel strongly,

6   work something out with Ms. Stewart.

7        MR. SELLINGER:  Your Honor, can I be briefly heard on

8   that?  This is AUSA Ryan Sellinger.

9        THE COURT:  Yeah, sure.

10        MR. SELLINGER:  So one of the things we're going for,

11   which we're going to articulate and provide to the Court, is

12   the stay-away.  And the individuals and their home locations

13   and the electronic monitoring would be significantly easier,

14   and frankly necessary, to enforce the stay-away.

15        THE COURT:  Okay.  Hold on --

16     -- (parties overspeaking) --

17        THE COURT:  Hold on.  What about Ms. Stewart's concern

18   that he might be out of GPS range given where he lives?  What

19   can we do about that?

20        MR. SELLINGER:  Your Honor, I'm not sure.  From our

21   perspective, we're obviously, you know, in the position we

22   are where we're opposing release and we have, as I just said,

23   significant safety concerns.  So I think that, given that he

24   is being released, it is the least restrictive condition.  I

25   don't know -- I don't even know what a GPS range is.  So I'm

1    not sure of what could be done to accommodate that, but we

2    think electronic monitoring, at a minimum, is necessary under

3    these circumstances.

4         MS. STEWART:  Okay.  Your Honor, if I may, I mean,

5    I do know these devices, and I do know the problems from

6    multiple other people, attorneys and defendants, and the fact

7    of the matter is there's a requirement to be in cell phone

8    range if you're in a building or something else and you're not

9    outside, and these are rural areas where he's not going to be.

10   And then he's going to get ten calls, go stand here, stop your

11   work, go plug in, do this, and it serves no purpose because

12   it's not going to be an immediate warning.

13        And I think if the other two unnamed-to-date codefendants

14   are also told to stay away, we can tell them don't drive down

15   that road; if you have to, go do business somewhere else,

16   don't go down the road where their house is.  I think we can

17   make that order specific enough.

18        And the other thing I'm very concerned about is -- this has

19   happened to other people who do outside work around machinery,

20   is those ankle bracelets are dangerous.  They run loose.  They

21   get caught on things.  We could cause a serious injury.  And

22   to what purpose?  He's not a flight risk.  Because that's what

23   those were designed for, actually, to keep child predators in

24   a certain area and for flight risk, which he's not.

25        So I really, really want to object and argue against doing

1        something like that, because this could cause injury to him.

2            THE COURT:  All right.  Well, Mr. Sellinger, if

3        Mr. Mares goes to the local Dunkin Donuts and you have the GPS

4        he's at the Dunkin Donuts, I don't know, I assume the other

5        defendants, or the other stay-away people, don't have GPS

6        bracelets.  So even if you knew that, you wouldn't know that

7        they were together.  And I mean -- I guess these guys aren't

8        stupid enough to go to the house to meet if they have a GPS

9        anklet.

10           MR. SELLINGER:  So, Your Honor, we haven't anticipated

11       and drafted the stay-away order that we're now discussing, but

12       I imagine that there would be a location or locations that

13       would be included as part of that stay away, and the way to

14       enforce a stay-away for a location is both I guess someone

15       letting us know, and then also GPS monitoring.  And so that's

16       -- it's not just for individuals.  It's also for locations.

17           MS. STEWART:  Well, his cell phone gives pings and

18       locations.  So, again, if he's in a cell phone area, if

19       somebody wants to go back and check, Your Honor, you know, the

20       government can put into Google to tell where he was or for the

21       cell phone towers to provide that as opposed to risking him

22       being injured and precluding his work where, you know, he's

23       going to be places where again that GPS signal's not going to

24       get through the metal barn and again -- it just leads to let's

25       say he's violating his conditions of release.  That's all it

1    does at this point, other than offering to injure him.

2         THE COURT:  All right.  Hold on, everyone.  Just let

3    me think about this for a moment.

4     Okay.  First, we need to get Pretrial Services involved,

5    so I'm going to ask for their views on this.  It seems to me

6    that there should be some sort of compromise that we can

7    figure out that would address the government's concern.

8     I mean, I have to tell you, Ms. Boyles and Mr. Sellinger,

9    the reason -- and I'm not just saying he has to -- I think the

10   actual concern here is just minimal.  I mean, the guy

11   was out for two and a half years doing nothing after January

12   6, so -- you know.  You know.  I hope to God I don't get

13   proven wrong, but...

14        MS. BOYLES:  If I could just be heard for a moment on

15   that, I do think that the government's specific concern at

16   this point is what's changed in the past two and a half years

17   is Mr. Mares is now aware that two members of his community

18   have been involved in the criminal justice system as part of

19   this case and as a part of this investigation, and he knows

20   who those individuals are.

21     And so we do have a heightened safety concern, as with any

22   cooperator in any criminal case, that there's a potential

23   threat to those individuals.  So the request for electronic

24   monitoring is to make sure that we can be assured of their

25   safety.  And if there is some kind of violation, understanding

that they may cross paths in common areas in their community,
we do think a method for verifying that he has not otherwise
violated a potential stay-away order that we will draft is of
paramount importance for the safety of those individuals.

And with regard to Ms. Stewart's suggestion that we could
somehow just ping his phone, as I'm sure Your Honor
understands, that would require getting a search warrant.
I'm not actually sure that we could get -- I haven't looked --

THE COURT:  It's not even practical because he can just
leave his phone in his house.

MS. BOYLES:  Saying we could track his phone --

THE COURT:  You don't have to convince me on that,
Ms. Boyles.  That's a nonstarter.

MS. STEWART:  Well, Your Honor, I would put in --

THE COURT:  Yes --

MS. STEWART:  Okay.

THE COURT:  Go ahead.

MS. STEWART:  I don't know why Ms. Boyles thinks this
is news.  ████████████ told Mr. Mares over a year ago that he
was having to get a lawyer and he was being prosecuted in some
way or another.  This isn't news.  Mr. Mares could care less
about what ████████ and ████████ say.  He doesn't care about
them.  And as a matter of fact, as I mentioned in my motion,
it's all the more to his benefit if the government wants to
bring him as a witness.  His view is bring them on because

1      their testimony and their prior inconsistent statements are

2      to his benefit.

3          Their safety is of paramount importance to him.  He doesn't

4      want to see any injury come to them, nor has he ever in his

5      entire life injured any person.  And to say we're going to

6      essentially put on something that would be a punishment, not

7      a least restrictive means of saying he abides by release

8      conditions but using it almost as a punishment just against

9      him, it doesn't even make sense unless all three are wearing

10     ankle monitors.  And none of them need to be wearing ankle

11     monitors, based on where they live and everybody knows what's

12     going on.

13         THE COURT:  Okay.  Here's what we're going to do.

14     I'm going to ask Pretrial Services to weigh in.  If Pretrial

15     Services recommends ankle bracelets, I am going to require

16     that.  However, I am going to ask for -- I am going to give

17     Ms. Stewart the right to update me every 21 days.  We'll

18     figure out some language where if it's actually causing issues

19     with respect to his work or with respect to dropped cell

20     phones or whatever, then I will revisit it.

21         So basically, Ms. Stewart, I'm just -- I'm not going to

22     assume it's going to be a problem.  If Pretrial Services wants

23     the ankle bracelet that the government makes -- I mean, I tend

24     to agree that your logic sounds better.  But I am letting the

25     guy out of prison, so seems like an ankle bracelet is something

1  he would prefer to trade than prison.

2      But, again, if it becomes the problem that you think it's

3  going to become, then I'll give you the right to come back,

4  and we can have another phone call and we can figure out if it

5  actually is needed or if it's actually more hassle than it's

6  worth.  Okay?

7          MS. STEWART:  Thank you very much, Your Honor.

8          MS. BOYLES:  Your Honor?

9          THE COURT:  Yes, Ms. Boyles.

10          MS. BOYLES:  I apologize.  I don't perhaps know the

11  precise language of what I'm asking for, but I would ask,

12  I guess nunc pro tunc, to redact the names that Ms. Stewart

13  just put on the record because --

14          THE COURT:  Yeah.  Could you please -- Ms. Court

15  Reporter, I'm ordering that those names be stricken from

16  the record.

17          MS. BOYLES:  Thank you, Your Honor.

18          THE COURT:  All right.  Anything else?

19          MS. STEWART:  Your Honor, if I may, do we have at least

20  a projected time when he will be able to walk out the doors?

21  I know we're going to do release conditions.  Can we have a

22  date, because we want to have his wife there with IDs.  He

23  obviously has to get back to Texas, and I plan to go up and

24  assist him in getting outside the prison doors, or the jail

25  doors.

1    THE COURT:  Yeah.  There's also going to be a D.C.

2    stay-away order.  So that should be part of your conditions as

3    well.  I have no idea how all this works.  I'm actually trying

4    to figure it out as we speak.  I want this guy out of prison.

5    He shouldn't be in prison.  I will make this happen as quickly

6    as I can.  I just don't know how long that will take.  If you

7    guys can agree on the probation -- if we can talk to Pretrial

8    and get that done tomorrow, or Friday at the latest, I mean

9    I'll enter the order as soon as I get the go-ahead.

10    MS. STEWART:  Okay, Your Honor.  Well, I'd ask that the

11    government and I come to an agreement by no later than close

12    of business tomorrow.

13    THE COURT:  Well, I'm doing a lot to Ms. Boyles right

14    here.  Ms. Boyles, please try to get it tomorrow if you can.

15    I want this guy out of prison, okay?

16    MS. BOYLES:  Absolutely, Your Honor.  And I apologize,

17    one more matter for the Court's consideration:  At our prior

18    status conference, you had tolled the speedy trial between

19    that status conference and whenever we held this detention

20    hearing, so I would be asking the Court to make a interest-

21    of-justice finding, until we can set another status conference,

22    to continue tolling speedy.  I don't know if you want to put

23    something specific on the calendar, but at least toll speedy

24    in the interim while we certainly get these immediate issues

25    sorted out and continue to provide discovery and allow

1    Ms. Stewart to do whatever investigation she needs to do on

2    this case.

3              THE COURT:  All right.  Well, Ms. Stewart, I assume

4    that's okay with you.  I'm not going to make it endless,

5    though, Ms. Boyles.

6              MS. BOYLES:  Of course.

7              THE COURT:  Do you guys have an idea of when you want

8    to go to trial or when you guys will be ready -- I want to get

9    a trial date is what I want to get.

10             MS. STEWART:  Well, from the defense's position,

11   Your Honor, I mean, I'd like to have a status conference

12   somewhere by perhaps 10 or 15 January, and from there to be

13   able to give an assessment, because there is more discovery we

14   need to request.  There's a lot of video that we need to go

15   through to see, and it's not just what the government gave us,

16   what we don't have that exonerates him.  So I ask --

17             THE COURT:  Okay.  And you're okay with tolling the

18   Speedy Trial Act until -- Ms. White, we have the 16th free,

19   right, for a status hearing?

20             THE DEPUTY CLERK:  16th of which month, Your Honor?

21             THE COURT:  January 16th.  Do we have that free for a

22   status conference?

23             THE DEPUTY CLERK:  You'll still be in trial,

24   Your Honor.

25             THE COURT:  What's the next date that we have?

1          THE DEPUTY CLERK:  The 21st.

2          THE COURT:  Oh, that's what it was, the 21st.

3      Can you guys do a status conference hearing on the 21st?

4          MS. STEWART:  Yes, Your Honor, for the defense.

5          MS. BOYLES:  I'm sorry.  Tuesday the 23rd?  The 21st

6      is a Sunday.

7          THE COURT:  All right.  January 23rd.  Can we all do

8      the 23rd?

9          MS. BOYLES:  Yes, Your Honor.

10          MS. STEWART:  I will be in another trial, so the --

11      after that.  So the following week will be okay if there's

12      available time then?

13          THE COURT:  All right.

14      Ms. White, how's January 30 look?

15      All right.  Can we all do January 30 at 11 a.m. Eastern?

16          MS. BOYLES:  Yes, Your Honor.  Would you like that in

17      person?

18          THE COURT:  No.  I think we can do it by video.

19      Okay.  Ms. Stewart, does that work for you?

20          MS. STEWART:  Yes, Your Honor.  Thank you.

21          THE COURT:  All right.  So, basically, what we're

22      doing going forward is you all are going to draft up release

23      conditions, we're going to reach out to Pretrial Services.

24      I'm going to draft up an order with the release conditions.

25      I'm going to enter that order as soon as possible unless I

1    enter -- unless Pretrial Services recommends something that

2    you all didn't agree to or unless there's some dispute.

3        I'll obviously give the parties time to think about that,

4    but otherwise I'm entering an order as soon as you guys get

5    agreement on these conditions.  And I'm hopeful that that can

6    happen Friday, and ideally no later than Monday.  And then we

7    are all going to meet again on January 30th at 11 a.m. Eastern.

8        By that point I want you all to come up with three proposed

9    trial dates and an idea of how long you think trial will last

10   and whether you have any idea whether you want a jury or a

11   bench trial, which of course I will not hold you to, but we

12   need notice.  Anything else that we should be discussing?

13       MS. BOYLES:  Just to make the record clear, you are

14   tolling speedy trial between now and January 30th?

15       THE COURT:  Yes, I am, with no objection from the

16   defense.

17       MS. BOYLES:  That's all for the government, Your Honor.

18   Thank you very much.

19       THE COURT:  All right.  Ms. Boyles, did I give you all

20   the *Brady* speech the last time we met?

21       MS. BOYLES:  Yes.  I have gotten the speech both in

22   this case and in others.

23       THE COURT:  Great.  All right.  I'm just going to wear

24   a T-shirt from now on for my criminal status conferences.

25       (Laughter)

1          MS. BOYLES:  Thank you, Your Honor.

2          THE COURT:  Thank you, everybody.

3          MS. STEWART:  All right.  Thank you very much,

4     Your Honor.

5          MR. SELLINGER:  Thank you, Your Honor.  Take care.

6        (Proceedings adjourned at 3:25 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne